STATE OF IOWA ex rel. GEORGE CROWDER et al., Appellants,
v. WALTER E. SMITH, Appellee.

No. 45930.

JUNE 16, 1942.

OPINION MODIFIED AUGUST 11, 1942.

John M. Rankin, Attorney General, and Jens Grothe, Assistant Attorney General, for appellants.

Merrill Gilmore and Bailey C. Webber, both of Ottumwa, for appellee.

STIGER, J.—This action was brought by relators to remove defendant from office under the provisions of Code section 1093, subsection 3, which provides that the petition may be filed, as to other than state officers, by five qualified electors of the county where the duties of the office are to be performed.

The petition charged defendant, a supervisor of Wapello county, was guilty of willful misconduct, corruption, and willful maladministration in office.

To warrant removal of a public officer, under chapter 56, 1939 Code, entitled "Removal from Office," there must be a willful intent to do wrong, an evil purpose upon the part of the accused, established by clear, convincing, satisfactory evidence.

In State ex rel. Hammond v. Missildine, 215 Iowa 663, 664, 254 N. W. 303, 304, Justice Evans, speaking for the court, said:

"The material charges were not proved. In the absence of willful misconduct and corrupt motives on the part of the defendant, mere error of judgment, either as to law or fact, will not justify his removal from office."

For other authorities on this subject, see, State ex rel. Barker v. Meek, 148 Iowa 671, 127 N. W. 1023, 31 L. R. A., N. S., 566, Ann. Cas. 1912C, 1075; State ex rel. Fletcher v. Naumann, 213 Iowa 418, 239 N. W. 93, 81 A. L. R. 483; State ex rel. Cochran v. Zeigler, 199 Iowa 392, 202 N. W. 94; State v. Manning, 220 Iowa 525, 559 N. W. 213; State ex rel. Cash v. Can-

ning, 206 Iowa 1349, 221 N. W. 923; State ex rel. Gebrink **v.** Hospers, 147 Iowa 712, 126 N. W. 818, Ann. Cas. 1912B, 754.

Defendant was elected supervisor of Wapello county in 1934, for a three-year term, and has occupied the office continuously since that time, having been re-elected to the position in 1940. Relators commenced this action on June 12, 1941. The petition contains 18 charges of willful misconduct and corruption against defendant. No proof was offered to sustain several of the accusations, and on appeal plaintiffs abandoned all but seven of the charges which they claim "taken as a whole justified the removal of defendant."

 I. One of the accusations against defendant, a farmer, which relators claim constitutes convincing evidence of bad faith and corruption, is that the board of supervisors purchased two stokers for the county home in 1937 at an exorbitant price.

The county home was destroyed by fire in August 1936. In November 1937, a contract was entered into for a new home. The plans and specifications called for the installation of two boilers, but did not include stokers. After the contract was executed, the board purchased two stokers from George Mier of Ottumwa, paying $1,975 for each stoker. The claim of Mier was approved by all members of the board and was paid by two warrants, each warrant being in the sum of $1,975.

A witness for plaintiffs testified that the reasonable value of each stoker when installed was $750. Before purchasing the stokers, the board requested an opinion from the county attorney whether it was necessary to advertise for bids on the stokers and enter into a written contract under the provisions of Code section 5131. After being advised that it was not necessary to advertise for bids, the board purchased the stokers from Mier without securing prices from other dealers. Defendant testified that before the stokers were purchased the board examined the records of the board of supervisors of 1932, which are in evidence, and found that it had purchased a stoker for the courthouse for $1,300, which had never operated successfully; that after examining the stoker at the courthouse, which had proved so defective that it could not be used, and comparing it with the specifications submitted by Mier for the two stokers,

he thought the price was a fair one for a modern, up-to-date stoker. The witness further testified that he became acquainted with Mier when he was awarded the county coal contract; that after Mier obtained the contract the price of coal "went up very greatly" in the year 1936, but nevertheless Mr. Mier delivered the coal at the contract price. "That fact created in my mind the feeling he was a 'square shooter'. * * * Q. After reading that [checker's report that covers this stoker transaction] and assuming the truth of the statements about what George Mier paid for the stokers, what would you say as to whether or not you got 'gypped'? A. I say we did get 'gypped'. I did not out of that stoker deal, directly or indirectly receive or obtain in any way any money or other thing of value. When I bought them I was in good faith thinking it was a proper purchase."

Mr. Horan, a witness for relators, and a member of the board at that time, testified in substance:

"Mr. Mier says 'if you don't buy them [stokers] now they are going to raise 10% and you had better not put it off too long'. During the time that we contemplated building the county home, the subject of getting the most for the money was discussed time and again. The general contract for the wiring, plumbing and heating was let to the lowest reasonable bidder. I admit that so far as these stokers are concerned, I talked to only one man with reference to the purchase of that heating equipment and that was George Mier. As a board of supervisors, we had some dealings with George Mier before these stokers were purchased. Had a contract with him by which he furnished coal to some of the county buildings. After the contract was made, the market price went up, but Mr. Mier continued to furnish coal at the contract price. I had confidence in Mr. Mier. I never received from George Mier, or anybody else, any money or anything of value because of making this contract to buy the stokers. I am a farmer. I have farmed for 50 years. The board of supervisors went down to the Mier Coal Company because they had a factory representative whom I thought knew as much about stokers that was necessary to be known. We wanted expert advice

about stokers. He knew all of the necessary facts about the horse power stokers we were looking at. He recommended the particular stokers that were installed in the county home. This representative said it would be a good buy. I was informed that the county attorney advised the board that such a purchase could be made.''

II. In 1938, Les Corbett, county farm steward, bought over $800 worth of hogs for the county at a public sale held by Guy Hanna and son. Mr. Hanna was a member of the board of supervisors at that time. The charge against defendant is that he voted to approve and pay the claim filed against the county for the hogs, with full knowledge that the sale by Hanna to Mr. Corbett for the county was in violation of Code section 13327, which prohibits a supervisor from selling supplies to the county in which he is a member of the board.

Mr. Corbett testified that there were no young sows at the county home; that he attended the Hanna sale and bought 25 young sows and two boars—all thoroughbred, Black Poland Chinas; that the price paid for the animals was fair and reasonable; that there was a surplus of grain on the farm; that in 1939 he sold from the increase $2,195.75 worth of hogs and retained on the farm the remaining 90 pigs. He did not know it was illegal for Mr. Hanna to sell the animals to the county at public sale. The auctioneer testified the hogs sold Corbett were purebreds; that they had a pedigree which was read; each hog was catalogued, and the price paid for the hogs was fair and reasonable.

Defendant testified:

''I saw Mr. Corbett buying stuff at that auction sale. I considered the hogs good stock. * * * I feel like the county profited by the purchase of the Hanna hogs. The hogs at the county farm were improved by the purchase of these critters [hogs] at the Hanna sale. When Mr. Corbett went out there, they had fair hogs. They were not as good as those purchased at the Hanna sale. I did not profit directly or indirectly in connection with the purchase by the county of those hogs at the Hanna sale. At the time these hogs were bought, it was the proper thing to do in my opinion.''

III. Another accusation is that defendant voted to approve a claim for a two-years' supply—1938–1940—of soap, insecticides, and disinfectants of the Western Chemical Company, in the sum of $2,701.65, ordered by the sheriff of the county, whose approval was endorsed on the claim. The supplies had been delivered to and used by the county. In 1941, the board of supervisors purchased soap for the same price charged by Western Chemical Company in 1938. Ed Love, county auditor, a witness for plaintiffs, testified the claim was for soap, etc., furnished Wapello county from November 5, 1938, to October 1, 1940; that the bill was presented in the fall of 1940. He testified substantially as follows:

"We couldn't pay it because of financial conditions. It was again presented to the board in 1941. The board intimated to the salesman and me that it would be paid. It was our understanding that the board would approve this claim. The ex-sheriff claimed the materials had been delivered to the county and the claims were 'okayed' by him. After all, the board would have no personal knowledge whether or not the soap was used. The propriety and justness of this claim was discussed when the defendant was present. This claim has not been paid. The board has recently approved similar claims for like amounts for the same company."

The witness further testified in substance:

"In connection with this big soap bill, Mr. Smith asked me to get an Opinion from the county attorney. I did not write for an Opinion because I talked to the county attorney in regard to it and he said he had no way to pass upon the bill. He said after the soap was delivered and used, it was up to the county to pay for it and he said it was within the discretion of the Board whether or not they 'okayed' the bill. The former sheriff told me personally the merchandise was delivered to the county and Mr. Mier the present sheriff said to the best of his knowledge it was delivered and used at the jail."

Finally, in April or May 1941, defendant approved this claim of the Western Chemical Company, upon learning that the soap had been delivered and used by the county and that the

claim was approved by the former sheriff. The other supervisors, Carlson and Shoemaker, refused to allow this claim. However, Carlson and Shoemaker later allowed another claim for like merchandise at the same price.

Mr. Carlson, a member of the board since 1939, was a witness for plaintiffs. He stated Mr. Love, the sheriff, and the salesman talked to the board about the bill in April 1941:

"Smith was present. The agent made some remark about if we could not pay the bill all at one time, we could make it in payments. I think Mr. Shoemaker spoke up and asked him why he had not presented the bill before; it was so old; * * *. I told him I would not be in favor of paying the bill until I found out more about it * * *. * * * Mr. Mier made the remark, as far as he knew the stuff had been delivered. The only thing I recall Mr. Smith saying was that he had talked to Mr. Mier and Mr. Mier thought the bill was 'okay', that the stuff had been received. * * * On this soap bill, I objected to the fact that the bill had run a long time and also the price of the soap. I have allowed a bill within the last month for the same price—* * * I voted to approve the bill for June of this year for a purchase of soap at the same price that is set down for the bill that I rejected. * * * The sheriff purchased this soap covered by the bill recently allowed. I took the sheriff's word for the fact that it had been delivered."

There is no evidence that the claim of the Western Chemical Company did not represent the fair value of the merchandise.

IV. Another charge is that defendant permitted private individuals to keep their saddle horses at the county farm for $6 a month, the defendant well knowing that such practice was wholly illegal and unauthorized.

Mr. Corbett, steward at the county home, stated:

"We boarded some horses for $6.00 per month. I think the price was fair and reasonable. At the time we took the horses, we had quite a lot of Timothy hay which was nothing less than horse feed and these business men, one at a time, came and asked me if they could keep their horses out there if they would pay to keep them and I figured that would be a good way of marketing this Timothy hay which there wasn't any value on

the market at the time for. It wasn't worth baling and hauling. I turned the rent money over to the county. I did not think it was unethical to do that—to the profit of the county. * * * The fellows that fed oats furnished their own oats. We furnished the hay and the care. * * * I run the county home to the best of my judgment. I figured how much the horses would eat and determined the fair and reasonable charge for the board of saddle horses. * * * The board hired me to operate the county home and they left most of that up to my judgment.''

The defendant testified in regard to this accusation as follows:

''With reference to these horses that were kept out at the County Farm, I acquiesced and approved of it as long as they were being paid for. I did not ask for an opinion of the county attorney on that—we were trying to dispose of the hay we had out there—timothy hay.''

The remaining two charges against defendant are not of sufficient merit to warrant discussion.

Relators do not contend, nor does the record even suggest, that defendant profited directly or indirectly from his official acts which they claim establish corrupt and willful misconduct and maladministration in office. Relators have failed to establish willful misconduct, an evil design, a purpose to do wrong on the part of defendant in the performance of the duties of his office and particularly with reference to the transactions forming the basis for the charges against him.

Several witnesses for defendant testified to his good character and good reputation for honesty and integrity. No attempt was made by relators to show his reputation was different than testified to by his character witnesses.

We are in full accord with the following statement of the trial court:

''After consideration of the evidence in this case, my conclusion is that no sufficient evidence has been introduced to establish wilful misconduct on the part of this defendant, or to establish any lack of integrity upon his part. He may have made some

mistakes, or, at times, in the opinions of others, may have exercised poor judgment; but any officer may make mistakes and still be absolutely honest. An officer may even be incompetent and still be honest and the soul of integrity. I don't believe that the evidence in this case establishes any dishonesty on the part of this defendant. In my opinion, there has been no evidence of any corruption, no showing that he has been unjustly enriched, or derived any personal advantage from any of the transactions shown. The State relies, in this case, on many and various charges claimed to constitute misconduct, necessarily 'wilful misconduct', and, therefore, in effect, alleges an intent on the part of this defendant to defraud the county, of which he is an officer, and the taxpayers of that county. Such a guilty intent has not been established by the evidence.''

This court said in State ex rel. Cochran v. Zeigler, 199 Iowa 392, 396, 202 N. W. 94, 95:

''Not every technical violation of a statute, or of official duty, will, however, justify the summary removal of the officer. It seems to us that the rule stated in State v. Meek, supra [148 Iowa 671] is applicable and controlling in this case.''

We quote from State ex rel. Barker v. Meek, 148 Iowa 671, 680, 127 N. W. 1023, 1026, 31 L. R. A., N. S., 566, Ann. Cas. 1912C, 1075:

''If it be admitted, as argued, that the primary purpose of the statute is the protection of public interests, it may well be said that those interests are not imperiled by acts of a trifling or unimportant character occasioning no injury against which the personal responsibility and official bond of the incumbent do not afford undoubted security. Such peril arises only when his administration of the office is marked by such grave misconduct or such flagrant incompetency as demonstrates his unfitness for the position. That this is the controlling idea of the statute we ourselves have decided. * * * To say that such an officer is to be removed in disgrace from the office to which he has been elected by the county in order to vindicate a law, the object of which is as we have said to 'rid the community of corrupt, in-

capable, and unworthy officials,' is to sanction a shocking injustice. * * * There is no man in official position so letter perfect in the law that he does not at some point by act or omission or misconstruction of the law, though with perfect integrity of motive, fall short of the strict statutory measure of his official duty. That such technical violations against which an ordinary civil action in damages affords a complete remedy should be classed as impeachable offenses calling for the removal of an officer is intolerable.''

V. Relators claim the court erred in entering judgment against them for attorney's fees and costs under the provisions of section 1093.1 of the 1939 Code, which reads:

''1093.1 Bond for costs. If the petition for removal is filed by any one other than the attorney general or the county attorney, the court shall require the petitioners to file a bond in such amount and with such surety or sureties as the court may require, said bond to be approved by the clerk, to cover the costs of such removal suit, including attorney fees, if final judgment is not entered removing the officer charged.''

The trial court was of the opinion that section 1093.1 superseded or repealed section 1112 and required judgment against relators for costs and attorney's fees provided for in section 1111 because final judgment was not entered against defendant, regardless of the question whether relators had reasonable cause for filing the complaint.

This assignment requires a construction of sections 1111, 1112 and 1093.1, all appearing in chapter 56, 1939 Code, relating to removal from office. The material part of section 1111 reads:

''1111 Effect of dismissal. If the petition be dismissed on final hearing on the merits, the defendant shall have judgment against the state, if the action was instituted by the attorney general, and against the county, city, town, or other subdivision of the state if the action is otherwise instituted, for the reasonable and necessary expenses incurred by the defendant in making his defense, including a reasonable attorney fee, to be fixed by the court or judge.''

Section 1112 reads:

"1112 Want of probable cause. If the action is instituted upon complaint of citizens, and it appears to the court that there was no reasonable cause for filing the complaint, such expense may be taxed as costs against the complaining parties."

Section 1093.1 was enacted long after the enactment of sections 1111 and 1112 and is chapter 22, Laws of the Forty-fifth General Assembly. The title to said chapter 22—section 1093.1—reads: "AN ACT to amend chapter fifty-six (56), code, 1931, relating to removal from office."

We agree with relators' contention that chapter 22 did not expressly or by implication repeal section 1112 and that they must be read together. We stated in Fowler v. Board of Trustees, 214 Iowa 395, 401, 238 N. W. 618, 621:

"It has ever been the general rule that if by any fair and reasonable construction prior and later statutes can be reconciled, both shall stand. If it can be avoided, no court can conclude that a statute is repealed by implication. * * * Any reasonable construction may be adopted to avoid a repeal by implication. State v. Brandt, 41 Iowa 593."

We find nothing inconsistent, conflicting, or incompatible in the two statutes.

Section 1111 provides that if the petition be dismissed on final hearing on the merits, defendant shall have judgment against the county, if the action is not instituted by the attorney general, for the reasonable and necessary expenses incurred by defendant, including reasonable attorney's fees.

However, section 1112 provides that such costs may be taxed against electors who filed the complaint if they acted without reasonable cause.

The intention of the legislature in amending chapter 56 by enacting section 1093.1 was to insure payment of said costs by citizens who instituted the action without probable cause by requiring them to file a bond. Under this section, the petitioners and their sureties are not liable for the costs, including defendant's expenses and attorney's fees, unless the court has

found, under the provisions of section 1112, that there was no reasonable ground for filing the complaint.

Section 1112 does not permit the costs and defendant's expenses and attorney's fees to be taxed against relators unless they had no reasonable cause for filing a complaint. This is a wise and salutary provision. Manifestly, good citizens would rarely exercise their privilege of filing a petition for the removal of corrupt public officials if, though having acted in the utmost good faith, and not only with reasonable but probable cause, for the benefit of the public, they would be penalized by being compelled to pay such costs if their petition was dismissed on final hearing.

We do not believe the legislature in enacting section 1093.1 intended to accomplish such result.

The court erred in entering judgment against relators and their sureties for said expenses and attorney's fees, which should be taxed against the county under the provisions of section 1111.

It should be stated that defendant does not seriously contend relators did not have reasonable cause for filing the complaint, the issue submitted being whether the dismissal of the suit demanded judgment against the relators for costs, expenses, and attorney's fees under the provisions of section 1093.1.

It is ordered that the costs in this court, including transcription of the reporter's notes, printing abstracts and briefs, and an attorney's fee of $350 for defendant's counsel, also be taxed by the trial court against Wapello county.

Affirmed in part; reversed in part, and remanded for further decree as to costs in harmony with this opinion.— Affirmed in part; reversed in part, and remanded.

BLISS, C. J., and MILLER, GARFIELD, OLIVER, HALE, WENNERSTRUM, and MITCHELL, JJ., concur.