**STATE of Iowa, Appellant,**

v.

**Harvey BARTZ and Arnold Buechele, Appellees.**

No. 55707.

Supreme Court of Iowa.

Dec. 18, 1974.

Richard C. Turner, Atty. Gen., and Roxanne Barton Conlin, Asst. Atty. Gen., Des Moines, for appellant.

William Pappas, Mason City, for appellees.

Heard by MOORE, C. J., and LeGRAND, REES, HARRIS and McCORMICK, JJ.

REES, Justice.

This is an appeal by the State from an order dismissing its action for the removal of defendants, Worth County Supervisors, under the provisions of Chapter 66, The Code, 1971. We reverse.

In April, 1971 an investigation was initiated by the state auditor's office and the Iowa Bureau of Criminal Investigation into the suspected misconduct in office of defendants, Harvey Bartz and Arnold Buechele, and one Boyd Harmon, the three members of the Worth County Board of Supervisors. The investigation focused on mileage claims submitted by defendants to Worth County, their alleged misuse of county funds and property, and their acceptance of gratuities in return for official favors.

During the course of the investigation by the state auditor's office, hearings were held to gather information. All of defendants refused to testify at such hearings on the grounds their testimony might tend to incriminate them, or subject them to public ignominy or disgrace. The information gathered at the hearings was subsequently laid before the Worth County grand jury. All defendants waived the Fifth Amendment privilege they had asserted at the prior hearings, and testified before the grand jury concerning the matters under investigation. No indictments against the supervisors were returned.

On July 27, 1972 the attorney general, under authority of § 66.3, The Code, 1971 filed actions in the district court of Worth County seeking removal of defendants Bartz and Buechele, and Harmon. In the petition it was asserted all of the parties had been guilty of willful misconduct or maladministration in office, willful or habitual neglect or refusal to perform the duties of their offices, and corruption. By agreement, the three causes were consolidated for hearing. Hearing was had and the court entered its order dismissing the actions against the defendants Bartz and Buechele, and removing Harmon from office. The State appeals from the dismissal of its actions against defendants.

▪ Actions for removal of public officers from office are summary in nature and are triable in equity. Section 66.18, The Code, 1971; Rule 334, Rules of Civil Procedure. There is essentially but one question before us as triers *de novo* on this appeal: Does the record compiled below contain sufficient evidence of misconduct on the part of defendants Bartz and Buechele as elected public officials to necessitate their removal from office under the provisions of Chapter 66. In resolving that question, we give weight to findings of the trial court, but nonetheless assume the responsibility of reviewing the entire record in determining the case anew on appeal. Vilter v. Myers, 255 Iowa 818, 123 N.W.2d 334; Storck v. Pascoe, 247 Iowa 54, 72 N.W.2d 467.

▪ I. We note preliminarily that in its conclusions of law, trial court commented on the refusal of defendants to testify at the hearings conducted by the state auditor and Bureau of Criminal Investigation on the grounds that to do so might incriminate them or hold them up to public ridicule and ignominy. The trial court correctly observed that the claim of the Fifth Amendment privilege against self-incrimination may be considered in a removal action. See Allen v. Lindeman, 259 Iowa 1384, 148 N.W.2d 610, and Amana Society v. Selzer, 250 Iowa 380, 94 N.W.2d 337. The trial court also noted the record before it indicated defendants had claimed the Fifth Amendment privilege on advice of counsel, however, and therefore gave little weight to the fact defendants made such claim, observing it would have reached the same conclusions without recourse to such evidence.

▪ We agree the record does indicate defendants claimed the Fifth Amendment privilege against self-incrimination on advice of counsel and agree with trial court the evidence of that claim is entitled to little weight in this controversy.

II. The record conclusively shows defendants were guests on an expense-paid fishing trip to a resort in Minnesota, and that defendants and their wives were guests on an expense-paid trip to a baseball game in Minneapolis. The hosts were Mr. Falk, a contractor, who testified he did an average of $50,000 in business with Worth County annually, Mr. Freudenburg, a tractor salesman, and Mr. Rosen, a concrete pipe salesman. Falk testified the total bill at the resort in Minnesota amounted to $576 and that it was split three ways among himself, Freudenburg and Rosen. John Barry, a Worth County engineer was also a guest on the trips mentioned above. Falk testified the expense-paid trips were in consideration for small favors that had been extended to him by the defendants. Defendants both testified they had extended

no favors to anyone in payment for the hospitality which had been extended to them.

The record indicates purchases were made by the supervisors on other than "low bid" bases, and that purchases could be made by them exercising personal judgments.

Freudenburg, the tractor salesman, testified he sold tractors to Bartz and Buechele for use in their supervisor districts, but had not been successful in selling any machinery for use in Supervisor Harmon's district. It is interesting to note that Harmon was not a guest on the junket to the fishing resort when Freudenburg was one of the hosts.

In commenting upon the acceptance by defendants of the expense-paid trips, trial court accepted as true the representation of the witnesses that no business was discussed on the trips, but noted one of the hosts testified the trips were for past favors, and that there was a strong implication from the testimony that such hospitality might have been in payment for future favors. Trial court observed there was no evidence in the record which induced it to conclude the donors of the favors reaped specific benefit to a greater degree following the trips than they had enjoyed prior to the extension of hospitality, and that defendants may well have avoided being influenced by such favors.

■ We view the evidence having to do with the extension of hospitality to defendants and the acceptance of the benefits of the expense-paid trips, as being violative of § 741.1, The Code, 1971. Said section provides:

"It shall be unlawful for any agent, representative, or employee, officer or any agent of a private corporation, or a public officer, acting in behalf of a principal in any business transaction, to receive, for his own use, directly or indirectly, any gift, commission, discount, bonus, or gratuity connected with, relating to, or growing out of such business transaction;

and it shall be likewise unlawful for any person, whether acting in his own behalf or in behalf of any copartnership, association, or corporation, to offer, promise, or give directly or indirectly any such gift, commission, discount, bonus, or gratuity. The provisions of this section shall not be construed to apply to officials or employees of the state of Iowa nor to legislators or legislative employees."

In a prosecution brought under the provisions of § 741.1, The Code, we held the acceptance of hospitality by county supervisors from private persons, when related to a business transaction, constitutes prohibited corrupt influence. State v. Prybil, 211 N.W.2d 308 (Iowa 1973). Our holding in *Prybil*, while in relation to a criminal prosecution rather than a civil action for removal of a public officer, is nonetheless pertinent to the matter before us.

■ The fact that § 741.1 is a penal statute and therefore must be narrowly construed and interpreted, and § 66.1(3) is a civil statute and may be more broadly interpreted is no reason for not relating them to each other *in pari materia*. See Goldman v. State, Tex.Civ.App., 277 S.W.2d 217, 222. See also Sutherland Statutory Construction, 4th Ed., Vol. 2A, § 51.03, page 298, and Vol. 3, § 59.08–59.09, page 26, *et seq*. We feel § 741.1 should be considered *in pari materia* with Chapter 66, The Code, and particularly § 66.1(3) thereof.

■ In *Prybil*, quoting from United States v. Irwin, 354 F.2d 192, 196, (2d Cir. 1965), cert. den. 383 U.S. 967, 86 S.Ct. 1272, 16 L.Ed.2d 308 (where the 2d Circuit Court of Appeals construed 18 U.S.C. § 201(f) and (g), a statute similar to § 741.1, The Code), we said:

"The statute does not require proof the transaction is corrupt, only that the transaction is the reason for the payment. If it is, the payment is corrupt but not necessarily the transaction. 'It is not necessary for the Government to show that the gift caused or prompted or in

any way affected the happening of the official act or had anything to do with its nature or manner or means by which it was performed.' " *Prybil, supra,* 211 N.W.2d at p. 312.

Reading §§ 741.1 and 66.13 *in pari materia,* and applying the standard of proof enunciated in *Prybil* with regard to prosecutions under the former to removal actions under the latter, we must conclude defendants' misconduct here in accepting favors from private contractors constitutes strong evidence of corruption under Ch. 66 just as it would violate § 741.1.

In fairness, we note *Prybil* was not available to the trial court in the instant case, as our opinion there was not filed until October 17, 1973. Had *Prybil* been available, we have little doubt trial court may well have reached a different result in these cases.

■ III. Plaintiff claims defendants entered into wrongful transactions involving county property, and failed to properly account for the proceeds of the sale thereof.

Each defendant maintained a petty cash fund, or what has been characterized in the record as a "slush" fund in his county office. These funds contained proceeds of sales of used county materials such as grader blades, scrap iron and culverts. In many instances payment for used materials was made by check, and the checks endorsed and converted into cash by defendants. No accounting was made of the funds. There was evidence the defendants and shop employees had access to the funds and that monies from them were used to purchase tools and miscellaneous supplies for the shops, as well as coffee and soup. There was no evidence either defendant personally drew on the funds for his own purpose.

By maintaining slush funds and failing to account therefor, defendants acted in violation of §§ 333.1, 333.2, 334.1 and 452.10, The Code, 1971, which vest authority in the county treasurer to keep and account for all public funds, and require warrants from the county auditor to be drawn for the disbursement of funds. Both defendants were cognizant of the foregoing Code provisions requiring that all public funds be deposited with the county treasurer and miscellaneous receipts be obtained therefor. Both also knew all purchases made by the county were to be paid for by warrants drawn by the county auditor after claims for the amounts due had been duly submitted and allowed.

We deem it significant that the record reveals a considerable reported increase of funds in the miscellaneous road equipment account after the slush funds were discontinued. While there is no clear, satisfactory or convincing evidence defendants profited in any way from the slush funds, we conclude the fact the funds were permitted to exist at all, as well as the manner in which they were maintained, constitutes strong evidence of willful misconduct and maladministration in office on the part of defendants.

■ IV. From July 19 to July 30, 1969 defendant Bartz was hospitalized following an appendectomy. Defendant Buechele was hospitalized from January 19 to February 3, 1971 for a heart condition. During the period of Bartz' hospitalization, Buechele presented a claim to the auditor for per diem and mileage on the part of Bartz, and signed Bartz' name thereto as claimant in the presence of the county auditor. While Buechele was in the hospital, Bartz presented a like claim for mileage to which he signed Buechele's name. Bartz' claim was for mileage in excess of 1200 miles purportedly driven while he was in the hospital. Buechele's claim was for mileage approximating 700 miles driven while he was hospitalized. There seems to be no question but that Buechele signed Bartz' claim with Bartz' full knowledge, and that Bartz signed Buechele's claim with Buechele's full knowledge. Both defendants testified they actually drove the miles for which the claims were filed, Bartz driving the miles in Buechele's territory for Buechele, and Buechele driving the miles in Bartz' territory for Bartz.

The claims were subsequently approved by the board of supervisors [Bartz, Buechele and Harmon] with knowledge of the circumstances, and were paid by warrants endorsed by the respective claimants. Much was made at trial of other alleged irregularities on the part of defendants in arriving at and submitting mileage claims to the county, plaintiff contending claims were submitted for periods when defendants were either out of state on personal business or precluded by weather from traveling in Worth County. In response to those allegations, both defendants admitted they kept no daily log, or record, of miles driven. They claimed they took the odometer reading from their pickup trucks, which they customarily drove in connection with their work as supervisors, on the first of each month and again on the last of each month, and then apportioned the total miles driven as reflected by the odometer readings over the secular days of the month. While it was established defendants used their pickup trucks for personal business, no explanation was given as to how they made allowance for non-county mileage reflected by the odometers.

There is evidence in the record indicating that from November 4, 1968 to May 27, 1971 Buechele claimed mileage for 22,810 miles in excess of the mileage reflected by the odometer on his pickup truck, and that Bartz, between December 9, 1966 and May 27, 1971 claimed mileage for 27,892 miles in excess of the mileage shown on the odometer on his truck. Defendants attempted to explain this excess of mileage by contending they drove their personal automobiles a part of the time on county business. The record indicates there were 664 miles of county roads in Worth County.

For the period beginning December 9, 1966 and extending through the first five months of 1971, defendant Bartz submitted mileage claims for approximately 127,000 miles. Defendant Buechele submitted claims for approximately 115,000 miles for the period extending from 1968 to the end of May, 1971. As noted, the total mileage claimed by Bartz for the period in question exceeded the mileage reflected by the odometer reading from his pickup truck by 27,892 miles. The total mileage claimed by Buechele exceeded the mileage shown on the odometer of his pickup by 22,810 miles. Both defendants attempted to explain the mileage claimed in excess of that reflected on their pickup odometers by contending they drove their personal automobiles on county business a part of the time.

The evidence adduced at trial lends some support to defendants' contention they used their personal automobiles on county business. The evidence also suggests, however, that at least Buechele used his pickup truck on personal business and that neither defendant used his personal automobile to any great extent on county business. Thus, despite their general assertions to the contrary, there is no totally adequate documented explanation in the record for the discrepancy between the mileage both defendants claimed and the readings from their pickup odometers.

The question squarely presented by the evidence concerning mileage claims is whether defendants' failure to account for the discrepancies detailed above, coupled with the inescapable fact the claims were unusually high, compels a conclusion the claims were excessive and unrelated to actual miles driven by defendants on county business. The trial court dealt with this question at great length and concluded the State failed to prove by clear, satisfactory and convincing evidence the claims were excessive.

After reviewing the entire record in this case, we reach an opposite conclusion. The record clearly establishes defendants' mileage claims were unusually if not improbably high and were at variance with the miles they actually traveled on county business. No satisfactory explanation for the discrepancy between the mileage they claimed and the mileage reflected on their pickup odometers was offered by either defendant. Accordingly, we conclude the

mileage claims submitted by both defendants were excessive and that in submitting them both committed acts of misconduct warranting removal under Chapter 66.

V. We have not overlooked in our review the other grounds urged by the State in support of its petition for removal of defendants, including the contention defendant Buechele engaged in self-dealing by buying and reselling to the county a grain bin, both defendants contravened the Code by permitting county machinery to be used by private persons for private use, and both were derelict in failing to properly spread assessments in county drainage districts. We feel we need not elaborate on these grounds as we conclude the proven acceptance of gratuities by defendants, the evidence relating to the maintenance of petty cash funds, and the collection by defendants of money for mileage not actually driven, are dispositive of this case.

VI. There has been relatively little resort to the statutes of this state dealing with the removal of public officers; hence, there is a relative paucity of case law either construing or applying the provisions of Chapter 66, The Code. This may be indicative of the fact the remedy provided by statute for the removal of duly elected public officials is heroic in nature and relatively drastic in a system where the usual method of removing officeholders is by resort to the ballot. See State v. Meek, 148 Iowa 671, 127 N.W. 1023.

■ In a removal action brought under Chapter 66, The Code, the burden rests on the petitioner to sustain the allegations of a petition by evidence which is "clear, satisfactory and convincing". See State v. Smith, 232 Iowa 254, 4 N.W.2d 267; State v. Nauman, 213 Iowa 418, 239 N.W. 93.

■ We have defined the "clear, satisfactory and convincing" standard of proof as the establishment of facts by more than a preponderance of the evidence, but something less than establishing a factual situation beyond a reasonable doubt. In re Henderson, 199 N.W.2d 111, 121 (Iowa 1972);

Words & Phrases, Permanent Ed., Vol. 7 at 624–625; Black's Law Dictionary, Revised 4th Ed. at 317.

■ We have said that in cases where a public official is charged with misconduct, maladministration or corruption under § 66.1, The Code, a showing is required the alleged *misconduct was commit-ted* willfully and with an evil purpose. State v. Zeigler, 199 Iowa 392, 202 N.W. 94; State v. Nauman, *supra*; State v. Roth, 162 Iowa 638, 144 N.W. 339. We have also said that acts which are simply irregular, even if violative of statutes, are not in themselves grounds for removal from office unless an evil and corrupt motive on the part of the officeholder is shown. State v. Manning, 220 Iowa 525, 259 N.W. 213; State v. Zeigler, *supra*. See also State v. Smith, *supra*. Self-dealing with the county, standing alone, has also been held insufficient grounds for removal of a public official when there was no showing he gained "inequitable profit" from the transaction. State v. Smith, *supra*.

The trial court in this case determined that all the actions of the defendants, except their submission of questionable mileage claims, including their use of county equipment to plow snow from private property, the maintenance of "slush" funds and failure to properly account therefor, the purchase of a grain bin for resale to the county, and the wrongful sale of county property, constituted violations of statutes but violations committed without evil or corrupt motives or purposes. The court therefore concluded the violations were not in themselves grounds for removing the defendants from office under the provisions of Chapter 66, The Code.

■ Under our *de novo* review of the record, we reach an opposite conclusion. The record is replete with evidence defendants' activities in office, with particular reference to their loose management of county funds, their acceptance of gratuities from contractors with whom they were required

to deal in their official capacities, and their acts in claiming payment for mileage not traveled, fell well below the standards of conduct expected of public officials. The order of trial court dismissing the removal actions against defendants must be reversed.

We therefore reverse the trial court. Defendants are removed from office for the terms they were serving at the date of entry of the decree of the trial court.

Reversed.