# IN THE SUPREME COURT OF IOWA

No. 17–0183

Filed June 29, 2018

**STATE OF IOWA,**

Appellee,

vs.

**ABRAHAM K. WATKINS,**

Appellant.

_____

Appeal from the Iowa District Court for Van Buren County, James M. Drew, Judge.

The defendant challenges his removal from office as the Van Buren County Attorney after the district court found he committed willful misconduct or maladministration in office. **REVERSED AND REMANDED WITH INSTRUCTIONS.**

Alfredo Parrish, Gina Messamer, and John Maschman of Parrish Kruidenier Dunn Boles Gribble Gentry Brown & Bergmann L.L.P., Des Moines, for appellant.

Thomas J. Miller, Attorney General, Jeffrey S. Thompson, Solicitor General, and Julie S. Kim, Assistant Attorney General, for appellee.

F. Montgomery Brown of F.M. Brown Law Firm, P.L.L.C., West Des Moines, Special Prosecutor, for appellee.

**ZAGER, Justice.**

An attorney removed from his elected position as Van Buren County Attorney challenges the district court order for his removal. Chapter 66 of the Iowa Code authorizes a district court to remove "[a]ny appointive or elective officer, except such as may be removed only by impeachment, holding any public office in the state or in any division or municipality thereof" in certain circumstances. Iowa Code § 66.1A (2015). We must now decide whether an elected county attorney was properly removed under this statute for sexual harassment. For the reasons set forth herein, we conclude that the conduct of the county attorney, while deserving the disapproval it received from the district court, did not rise to the level of misconduct that would warrant the "drastic" and "penal" remedy of a court order removing an elected official from office. *See State v. Callaway*, 268 N.W.2d 841, 842 (Iowa 1978) (using these terms to characterize chapter 66). We reverse the judgment of the district court and vacate the order removing the defendant from the office of Van Buren County Attorney. We remand the case for further proceedings consistent with this opinion.

## I. Facts and Procedural Background.

In May 2013, Abraham Watkins was sworn into the Iowa bar and subsequently opened a solo practice in Keosauqua, Iowa. Watkins operated his law practice out of an office located on the first floor or main level of the two-story home he shared with his family. Watkins and his family mostly lived upstairs. However, the home's kitchen, laundry room, and one of the two bathrooms are located on the main level, adjacent to the office area. Watkins's wife, Renee Watkins, worked closely with her husband in the law office as the office manager for his private practice. In September 2014, Watkins hired twenty-year-old Jasmin Wallingford as his legal assistant. Two months later, Watkins was elected as the Van Buren

County Attorney after running as an independent, and he assumed office on January 1, 2015.

Following Watkins's election as the Van Buren County Attorney, which is a part-time position, Renee began to split her time between serving as the office manager for her husband's private practice and the victim coordinator for the county attorney's office. Additionally, Wallingford began working part-time for Watkins in the county attorney's office, as well as part-time for him in his private law office.[1] Wallingford became close to the Watkins family, even labeling herself an "honorary family member." Wallingford and the Watkins family shared personal details of their lives with each other. During this time, Wallingford assisted Watkins and Renee with their young daughters and socialized with them outside of the office. These social events included out-of-town trips Wallingford took with the family in which they visited waterparks and stayed in hotels together.

Based on a recommendation from Chris Kauffman, a friend of Watkins, Watkins hired Virginia Barchman as a part-time assistant county attorney in April 2015. At the time, Barchman had been retired for five years after a twenty-four-year career as an attorney with the Iowa Attorney General's Office's Area Prosecutions Division. Barchman began working in the same first-floor office area shared by Watkins, Renee, and Wallingford, though tensions arose between Watkins and Barchman not long after Barchman's hiring. The pair engaged in a number of intense arguments that made it difficult for them to work together on cases.

Disagreements between Watkins and Barchman continued to escalate in the spring of 2016. Wallingford also began to look for other

---

[1]With the approval of the county board of supervisors, Watkins used his home office as his county attorney office.

employment beginning in the spring of 2016. After a domestic-abuse trial that was held in the summer of 2016, Barchman expressed her frustrations with Watkins by criticizing his performance during the trial and accusing him of "smelling like booze."[2] In August, Barchman obtained permission from the Van Buren County Board of Supervisors (Board) to work in a different office space in the Van Buren County courthouse due to issues she had with the noise in Watkins's office and Watkins himself. She labeled this new workspace an "Abe-free zone." Watkins soon began seeking job applications for an assistant county attorney, which Barchman interpreted to mean Watkins was looking to replace her.

Although Watkins disputed that he had been drinking during the trial, he clearly had an issue with alcohol abuse outside the workplace. Renee grew tired of Watkins's drinking habits, and the couple would constantly argue about their marital issues in the office. Finally, on August 5, Renee and the Watkinses' children left the home to visit Renee's family in North Carolina because Renee was exasperated with Watkins's drinking. As a result, Watkins contacted Kauffman, who helped Watkins receive medical care for his drinking issues. Watkins also contacted and met with Hugh Grady from the Iowa Lawyers Assistance Program. Grady recommended that Watkins immediately stop drinking, visit a counselor, attend Alcoholics Anonymous meetings, and maintain regular contact with him. Watkins took the necessary steps to follow through with these recommendations, beginning with his sobriety. Throughout these personal struggles during the summer of 2016, both Watkins and Renee confided in Wallingford for support.

---

[2]Wallingford, among others, later testified that Watkins was never intoxicated during the trial. The trial resulted in convictions of the defendant on all counts.

On August 9, Wallingford resigned from her positions with Watkins. Wallingford stated in her resignation letter, "I have learned many things in my time here, including what makes a hostile work environment." As her reason for leaving, she wrote, "Due to aberrant behavior and a hostile work environment, I no longer can continue my position and feel confident about coming into work." Kauffman met with Wallingford around the time of her resignation and encouraged her to write down all of her complaints regarding Watkins. Wallingford prepared her list in the week following her resignation. Barchman turned over Wallingford's resignation letter to John Finney, the Van Buren County Auditor, and contacted her former colleague Scott Brown in the Iowa Attorney General's Office about the resignation letter and Wallingford's complaints with Watkins.

Wallingford's list totaled approximately fifty-five complaints about her work with Watkins over the previous two years. The overwhelming majority of her complaints involved her frustration with the menial work tasks she was given and the way they made her feel inferior to Watkins. These complaints included "criticizing me in front of customers," "constant yelling between him [and] Renee," "the importance of him [and] not us," "my #1 job was to be there to answer the phone," and "[he] very often expected me to figure [work] out then remind me I didn't go to law school." While the majority of Wallingford's complaints dealt with work assignments and the lack of respect she felt she received, several of the complaints involved conduct potentially amounting to sexual harassment.

Wallingford reported that twice Watkins came down the stairs and entered the office area to get coffee while wearing only athletic shorts or boxer briefs in the early morning. On one of those occasions, Wallingford laughed and Watkins walked over to her desk. However, he did not stay

long. According to Wallingford, neither of these occurrences happened within six months of the filing of the petition for removal.

On another occasion, Watkins showed Wallingford two photographs of his naked wife and a video Watkins made of an incident where his wife accidentally squirted breast milk in Wallingford's car. The display of the photographs and the video occurred after work hours in the family kitchen while the family and Wallingford were having dinner together. Renee immediately objected to Watkins's display of the photographs, and the incident in the family kitchen ended upon her objection. Although the timing of this incident is unclear, it did not occur within six months of the filing of the petition for removal.

Additionally, Watkins made several sexual comments to Wallingford. Some of these occurred in the workplace. On one occasion, Watkins told Wallingford that her "boobs [were] distracting him." On another occasion, after seeing a particular woman, Watkins told Wallingford, "Man, I wouldn't want to see her naked." Watkins also complained to Wallingford that his wife did not want to have sex and said he wished he had a wife who wanted to have sex with him all the time. On another occasion, Watkins made an inappropriate sexual pun about the name of a cleaning product in the presence of Wallingford and two women custodians. Wallingford took this as a poor attempt at humor, and she knew that the other women did not understand it.

At a birthday party for one of his daughters, which took place in a park on a Saturday, Watkins commented to Kauffman about the breasts of a courthouse employee. The following Monday, Watkins attempted to bring up the subject again in front of Renee and Wallingford. Renee cut him off and told Watkins she did not want to hear about it.

On a different occasion, Wallingford was speaking with Renee about Wallingford's visit to a gynecologist. Watkins overheard this conversation and began to pester Wallingford about what was wrong with her, at which point Renee made a comment along the lines that Wallingford had a "broken vagina." Watkins later asked Wallingford on another occasion whether "her vagina was still broke." Finally, after Renee left the family home with their daughters on August 5, Watkins contacted Wallingford by telephone on Sunday night. During the course of a long and wide-ranging discussion, Watkins made the comment that he was glad he had kept nude photographs of his old girlfriends.

As noted above, Wallingford submitted her letter of resignation on August 9. Wallingford subsequently attempted to retract her resignation after Barchman informed her that she could work with Barchman from an office in the old courthouse. However, Wallingford was not rehired. She soon found employment with the Van Buren County Sheriff's Office.

Barchman also witnessed some of the incidents described above. On one occasion, Barchman saw what she believed to be Watkins appearing downstairs in his underwear. She made her objections to his behavior clear to Watkins, and there is no indication that this ever happened again in her presence. Further, Watkins used a crude sexual term as a nickname for a particular female attorney in Barchman's presence. She told Watkins that this was offensive to her, and she never heard him use the expression again.

Watkins also asked Wallingford if her "vagina was still broke" on one occasion when Barchman was present. Moreover, Barchman saw a photograph of Watkins's wife while she was pregnant, nude, and covered in blue paint on Watkins's computer screen by accident when she went to his office to discuss something with him.

Barchman could not recall hearing Watkins ever make a single "come-on" line to any female employee or client. Her initial complaints in July 2016 were about Watkins's performance during the aforementioned domestic-abuse trial. Her concerns at the time related to Watkins's alleged drinking during the trial.

In mid-August, Barchman forwarded Wallingford's letter of resignation to Jon Swanson, the attorney for Van Buren County. Swanson then notified the Board, which took steps to investigate the allegations against Watkins. The Board held two closed sessions to discuss the allegations and how to handle them. After the first closed session, the Board retained attorney Thomas H. Miller at the recommendation of Swanson to conduct a formal investigation and advise the Board on the best course of action.

Miller is a former Iowa Assistant Attorney General who has experience handling public-official misconduct. Miller was also Barchman's supervisor when the two worked in the Iowa Attorney General's Office. During his investigation, Miller spoke to a number of individuals in Van Buren County including Barchman, Wallingford, Kauffman, and the Van Buren County Sheriff. Miller never spoke with Watkins or Renee as part of his investigation. Further, Barchman incorrectly reported to Swanson and Miller that Watkins refused to cooperate with alcohol treatment recommendations made by Grady.

At the second closed session, Miller and the Board discussed the results of his investigation. During this discussion, Miller told the Board about possible ways to initiate removal proceedings of Watkins under Iowa Code section 66.3. One route included bringing the removal petition by five registered voters of the county as specifically provided for in section 66.3(3). Despite the existence of this method to initiate the proceedings,

Miller advised the Board that through "a little bit of legal wrangling," the Board could initiate the removal proceedings by appointing an acting county attorney under Iowa Code section 331.754(4) and the acting county attorney would then be authorized to initiate the action to remove the elected county attorney. The Board decided to proceed on this basis.

For reasons that are not apparent from this record, Miller did not contact the Iowa Attorney General's Office to have it initiate the removal action as specifically authorized by Iowa Code section 66.3(1). This is the method most often used in removal actions. Rather, upon Miller's recommendation, the Board retained attorney F. Montgomery Brown as acting county attorney and authorized him to initiate the removal action utilizing the procedure outlined above.

After Brown met with Watkins and learned he would not resign voluntarily, Brown filed the petition to remove Watkins from office pursuant to Iowa Code sections 66.11 and 331.754(4) on September 29. Once Brown filed the removal proceedings, the district court appointed him to appear on the State's behalf and prosecute Watkins's removal proceedings pursuant to Iowa Code section 66.12.

In its final amended petition, the State sought removal of Watkins on five separate grounds. Four involved allegations that Watkins engaged in "willful misconduct or maladministration in office" in violation of Iowa Code section 66.1A(2) by (1) creating a "hostile work environment" that included sexual harassment, (2) supplying a minor with alcohol in violation of Iowa Code sections 123.47(1) and 123.47(2)(*a*), (3) retaliation, and (4) accepting three private-practice cases that created conflicts of interest with his position as county attorney. The petition also sought Watkins's removal on the ground that he had been intoxicated in violation of Iowa Code section 66.1A(6).

Watkins filed a motion to dismiss the removal petition. The motion urged that the Board did not have the power to initiate a removal action under Iowa Code section 66.3, nor could the Board empower Brown to prosecute the action under Iowa Code section 331.754(4). Additionally, Watkins claimed a breach of contract by the county. Watkins alleged his signature on the Van Buren County Employee Handbook and consideration in the form of legal services and compliance with the county's rules created a binding contract. Watkins further claimed the county breached this contract when it did not "promptly name an impartial investigator" as provided for in the handbook. Watkins cited Miller's former working relationship and friendship with Barchman. Moreover, Watkins argued the Board violated the handbook's employment policy of progressive discipline by initiating termination before taking other, less drastic measures.

On October 28, the district court denied Watkins's motion to dismiss. The district court ruled the Board had the authority to appoint an attorney under Iowa Code section 331.754(4) to act as county attorney when the elected county attorney had a conflict of interest. The district court ruled that Watkins had an "obvious" conflict of interest in this civil proceeding. The district court reasoned that Brown, as the lawfully appointed acting county attorney on the matter, had the same authority over the matter for which he was appointed under Iowa Code section 331.754(4) as the elected county attorney. Thus, the district court found that Brown was considered a county attorney for purposes of Iowa Code section 66.3(5).

Trial on the petition for removal commenced on October 31 and continued sporadically over the next several months with final submission of evidence occurring on December 22. On January 3, 2017, the district

court issued its Order for Removal from Office. The district court ordered Watkins's removal from the office of Van Buren County Attorney solely based on the sexual-harassment claim. In reaching its decision, the district court found a "significant contrast between the recollections of the State's witnesses versus the recollections of Mr. Watkins; his wife; and current employee, Ms. Richardson." The district court found the State's witnesses more credible and considered their testimony to be truthful because nothing indicated the witnesses fabricated their testimony or had a substantial personal interest in the outcome in comparison to Watkins's witnesses, who, the district court noted, were not eager to testify.

In addition to the aforementioned complaints from Wallingford and Barchman, the district court also took into account testimony from Tayt Waibel and Kauffman. The district court found the testimony of Waibel, who had worked for Watkins in his private law office, to be truthful. Her testimony recounted inappropriate sexually charged remarks made by Watkins. One of those comments was directed at Waibel personally and occurred on a weekend after Watkins was served with removal papers. After making the inappropriate statement, Watkins acknowledged, "This is probably why I'm in trouble for sexual harassment." Moreover, the district court relied on testimony from Kauffman, who testified that Watkins liked to talk about sex, frequently offered to show him naked pictures of his wife, and once commented on the breasts of a courthouse employee.

In its decision to remove Watkins from office, the district court reasoned,

> During his tenure as County Attorney, Mr. Watkins has engaged in a pattern of conduct that is unacceptable by any reasonable standard. Many people, probably most, would consider much of his conduct to be outrageous or even

shocking. The fact that Mr. Watkins is an attorney trained in the law makes his behavior all the more troublesome. Iowa's Rules of Professional Conduct for attorneys recognize that lawyers holding public office assume legal responsibilities going beyond those of other citizens. A lawyer's abuse of public office can suggest an inability to fulfill the professional role of a lawyer. I.R.P.C. 32:8.4 Comment 5.

The State has proven that Mr. Watkins has engaged in misconduct or maladministration by regularly committing sexual harassment. The bigger question is whether his conduct was willful, which requires proof that he acted intentionally with a purpose to do wrong. . . .

. . . Mr. Watkins's inappropriate conduct was pervasive and existed over a significant period of time thereby negating any claim of mistake or an isolated lapse of judgment. His actions were clearly intentional. As a lawyer he knew better but continued to subject his two young female employees to sexually related banter, and in some instances images, that have no place in the work setting. This is especially true for a county attorney's office. Given the extent and stunning nature of his conduct one can, and in the Court's opinion must, infer that he was acting with a bad or evil purpose. Therefore, the State has established that his conduct was willful.

The State withdrew its retaliation claim at closing, conceding that it failed to prove Watkins retaliated against Barchman. The district court did not further address the retaliation allegation or the State's claim that Watkins supplied a minor with alcohol in violation of Iowa Code sections 123.47(2)(a) and 123.47(5). Additionally, the court made no findings of fact regarding the allegations that Watkins committed willful misconduct or maladministration in office based on the conflicts-of-interest claim against him, finding instead that none of the allegations justified Watkins's removal. The district court also found insufficient evidence to establish the State's intoxication allegation, noting that "substantial evidence," including the testimony of the presiding judge at the trial, established that

Watkins was not intoxicated in court.[3] The district court also did not make any findings regarding the Board's alleged breach of the handbook or the conflicts of the Board members who helped initiate the removal proceedings. Additional facts will be included within our following analysis. Watkins timely filed an appeal, which we retained.

## II. Standard of Review.

Our standard of review for rulings on questions of statutory interpretation is for correction of errors at law. *State v. Iowa Dist. Ct.*, 889 N.W.2d 467, 470 (Iowa 2017). In removal proceedings, the State bears the burden of proof to establish that the public official committed the charged acts of misconduct or maladministration in office with "willful intent to do wrong [and] an evil purpose upon the part of the accused, . . . by clear, convincing, satisfactory evidence." *State ex rel. Crowder v. Smith*, 232 Iowa 254, 255, 4 N.W.2d 267, 268 (1942). This standard requires the State to establish the facts "by more than a preponderance of evidence, but something less than establishing a factual situation beyond a reasonable doubt." *State v. Bartz*, 224 N.W.2d 632, 638 (Iowa 1974).

In determining whether the State has met this burden, we review the evidence submitted in a removal proceeding de novo. *Callaway*, 268 N.W.2d at 842.

> There is essentially but one question before us as triers [d]e novo on this appeal: Does the record compiled below contain sufficient evidence of misconduct on the part of [the] defendant[ ] . . . as [an] elected public official[ ] to necessitate [his] removal from office under the provisions of Chapter 66.

---

[3]As previously noted, the testimony of the witnesses confirmed that Watkins was never intoxicated during the trial, and the trial resulted in convictions on all counts.

*Bartz*, 224 N.W.2d at 634. To answer this question, we give the trial court's findings weight "but nonetheless assume the responsibility of reviewing the entire record in determining the case anew on appeal." *Id.*

**III. Analysis.**

Watkins presents a number of issues on appeal. First, Watkins challenges the manner in which the removal action was initiated. Second, Watkins disputes the district court's determination that his conduct amounted to willful misconduct or maladministration in office. *See* Iowa Code § 66.1A(2). Third, Watkins contends the district court should have dismissed the removal action because Van Buren County did not retain an impartial investigator to investigate the allegations of sexual harassment as promised in the employee handbook. Fourth, he asserts the district court should have dismissed the removal action because it was tainted by a conflict of interest. Fifth, Watkins claims the district court should have dismissed the removal action because the Board failed to implement the progressive disciplinary procedures set forth in the handbook before initiating the removal process. Finally, Watkins argues he is entitled to attorney's fees on the dismissed grounds for removal.

**A. The Initiation of Removal Proceedings.** Watkins contends the district court erred when it denied his motion to dismiss the removal action against him because the Board unlawfully initiated the removal proceedings. He maintains that the Board could not empower an acting county attorney appointed under Iowa Code section 331.754(4) to initiate removal proceedings because only the elected county attorney or attorney general may initiate removal proceedings as the sole complainant under Iowa Code section 66.3. Watkins also argues allowing the Board to appoint an acting county attorney to prosecute the removal proceedings under section 331.754(4) would render the special-prosecutor provision of

section 66.12 superfluous. We begin our analysis by reviewing the relevant statutes regarding removal and the appointment of an acting county attorney.

Iowa Code section 331.754(4) provides, "The board may appoint an attorney to act as county attorney in a civil proceeding if the county attorney and all assistant county attorneys are disqualified because of a conflict of interest from performing duties and conducting official business." Iowa Code § 331.754(4). Iowa Code section 66.3 is specific to removal and states the following:

The petition for removal may be filed:

> 1. By the attorney general in all cases.
>
> 2. As to state officers, by not fewer than twenty-five electors of the state.
>
> 3. As to any other officer, by five registered voters of the district, county, or municipality where the duties of the office are to be performed.
>
> 4. As to district officers, by the county attorney of any county in the district.
>
> 5. As to all county and municipal officers, by the county attorney of the county where the duties of the office are to be performed.

*Id.* § 66.3. Finally, Iowa Code section 66.12 states, "When the proceeding is brought to remove the county attorney, the court may appoint an attorney to appear in behalf of the state and prosecute such proceedings." *Id.* § 66.12.

Nothing in Iowa Code section 66.3 distinguishes between elected and acting county attorneys. "When a proposed interpretation of a statute would require the court to 'read something into the law that is not apparent from the words chosen by the legislature,' the court will reject it." *State v. Iowa Dist. Ct.*, 730 N.W.2d 677, 679 (Iowa 2007) (quoting *State*

*v. Guzman-Juarez,* 591 N.W.2d 1, 2 (Iowa 1999)). Still, incorporating section 331.754(4) into section 66.3 could potentially allow a county board of supervisors to circumvent the limits of section 66.3 since "county boards of supervisors" are not among the entities authorized to bring removal petitions. *See* Iowa Code § 66.3. Nonetheless, in this case we do not have merely the Board's action appointing Brown pursuant to section 331.754(4). The district court also appointed Brown pursuant to section 66.12. Therefore, without deciding whether Brown would have had authority to pursue the removal action if the court had *not* appointed him under section 66.12, we decline Watkins's request to hold the removal petition should have been dismissed based on lack of authority.

**B. Removal from Office.** Iowa Code section 66.1A states,

> Any appointive or elective officer, except such as may be removed only by impeachment, holding any public office in the state or in any division or municipality thereof, may be removed from office by the district court for any of the following reasons:
>
> 1. For willful or habitual neglect or refusal to perform the duties of the office.
>
> 2. For willful misconduct or maladministration in office.
>
> 3. For corruption.
>
> 4. For extortion.
>
> 5. Upon conviction of a felony.
>
> 6. For intoxication, or upon conviction of being intoxicated.
>
> 7. Upon conviction of violating the provisions of chapter 68A.

Iowa Code § 66.1A. "A proceeding to remove a public officer under this statute is a drastic one and is penal or quasi-criminal in character." *City of Des Moines v. Dist. Ct.,* 241 Iowa 256, 262, 41 N.W.2d 36, 39 (1950).

"Removal is drastic and penal." *Callaway*, 268 N.W.2d at 842. "The object 'is to rid the community of a corrupt, incapable or unworthy official.' " *Id.* (quoting *State v. Welsh*, 109 Iowa 19, 21, 79 N.W. 369, 370 (1899)). "[T]he remedy provided by statute for the removal of duly elected public officials is heroic in nature and relatively drastic in a system where the usual method of removing officeholders is by resort to the ballot." *Bartz*, 224 N.W.2d at 638.

We have previously emphasized the summary and expedited nature of removal and noted that it "implement[s] a legislative intent that a public officer guilty of willful misconduct or maladministration be removed during the same term of office in which the conduct occurred that provided grounds for removal." *State ex rel. Doyle v. Benda*, 319 N.W.2d 264, 266 (Iowa 1982). Essentially, removal proceedings exist to provide a remedy when the misconduct is serious enough that waiting until the next election is inadequate. *See id.* (noting that removal proceedings are designed to occur before the next election and are mooted if the official is voted out of office or reelected with knowledge of the alleged wrongdoing). They are meant to protect public interests, and those interests are imperiled when a public official's "administration of the office is marked by such grave misconduct or such flagrant incompetency as demonstrates his unfitness for the position." *State ex rel. Barker v. Meek*, 148 Iowa 671, 680, 127 N.W. 1023, 1026 (1910).

The State bears the burden of proof in removal proceedings to establish the alleged wrongdoer's "willful intent to do wrong [and] an evil purpose upon the part of the accused, . . . by clear, convincing, satisfactory evidence." *Smith*, 232 Iowa at 255, 4 N.W.2d at 268. This standard of proof is defined as "the establishment of facts by more than a preponderance of the evidence, but something less than establishing a

factual situation beyond a reasonable doubt." *Bartz*, 224 N.W.2d at 638. Moreover, with regard to section 66.1A(2), the phrase "in office" modifies both "willful misconduct" and "maladministration," so the State bears the additional burden of showing by clear, convincing, and satisfactory evidence that the alleged wrongdoer's acts were committed within the scope of his or her official responsibilities. *See, e.g., State ex rel. Gebrink v. Hospers*, 147 Iowa 712, 714, 126 N.W. 818, 819 (1910) (noting removal "should be exercised only in cases of official wrongdoing established by clear and satisfactory evidence").[4] Therefore, the public official's alleged

---

[4]The standard we have described requiring the public official to have committed the misconduct within the scope of official responsibilities under chapter 66 generally comports with those followed in other jurisdictions. *See, e.g.*, Ala. Const. art. VII, § 173(a) (allowing for the removal of certain public officials "for willful neglect of duty, corruption in office, incompetency, or intemperance in the use of intoxicating liquors or narcotics to such an extent, in view of the dignity of the office and importance of its duties, as unfits the officer for the discharge of such duties for any offense involving moral turpitude while in office, or committed under color thereof, or connected therewith"); Kan. Stat. Ann. § 60-1205 (West, Westlaw through 2018 Reg. Sess.) (providing Kansas public officials, "except those subject to removal from office only by impeachment," must forfeit office if they "(1) willfully engage in misconduct while in office, (2) willfully neglect to perform any duty enjoined upon such person by law, (3) demonstrate mental impairment such that the person lacks the capacity to manage the office held, or (4) . . . shall commit any act constituting a violation of any penal statute involving moral turpitude"); Utah Code Ann. § 10-3-826 (West, Westlaw through 2018 Gen. Sess.) ("In case any municipal officer shall at any time wilfully omit to perform any duty, or wilfully and corruptly be guilty of oppression, malconduct, misfeasance, or malfeasance in office, the person is guilty of a class A misdemeanor, shall be removed from office, and is not eligible for any municipal office thereafter."); *id.* § 77-6-1 ("All officers of any city, county, or other political subdivision of this state not liable to impeachment shall be subject to removal as provided in this chapter for high crimes and misdemeanors or malfeasance in office."); *State ex rel. Hardie v. Coleman*, 155 So. 129, 132 (Fla. 1934) (en banc) ("Malfeasance [as grounds for removal of a public official] has reference to evil conduct or an illegal deed . . . . [Further,] misfeasance has reference to the performance by an officer in his official capacity of a legal act in an improper or illegal manner. . . ."); *Maddox v. Williamson Cty. Bd. of Comm'rs*, 475 N.E.2d 1349, 1355 (Ill. App. Ct. 1985) (defining "malfeasance" and "misfeasance" as grounds for removal in the same manner as Florida did in *Hardie*); *Woodward v. Commonwealth*, 984 S.W.2d 477, 479 (Ky. 1998) (holding a public official is guilty of malfeasance when he or she "perform[s] an official act" and the act is "wrongful, unjust or constitute[s] gross negligence"); *Ekstedt v. Village of New Hope*, 193 N.W.2d 821, 828 (Minn. 1972) (finding a public employee can be discharged for just cause or misconduct when that cause is "one which specially relates to and affects the

wrongdoing must take place within his or her capacity as a public official and not when the official was acting as a private citizen.

As we have noted, the district court removed Watkins from office for sexual harassment, either rejecting or not reaching the other grounds. The State does not argue on appeal that any of those other grounds should have been sustained. Thus, our sole duty on appeal is to decide whether the allegations of sexual harassment are such as to constitute willful misconduct or maladministration in office warranting removal from office.

1. *Defining "willful misconduct or maladministration."* We have defined "willfully" in the removal context to mean that the public official must act "intentionally, deliberately, with a bad or evil purpose, contrary to known duty." *State v. Roth*, 162 Iowa 638, 651, 144 N.W. 339, 344 (1913). In the removal context, "[c]onduct may be voluntary, thoughtless, or even reckless, yet not necessarily willful. Nor does unlawfulness necessarily imply willfulness." *Meek*, 148 Iowa at 674, 127 N.W. at 1024 (citation omitted).

We have routinely applied a subjective-intent standard to examine the public official's purpose when he or she engaged in the charged acts to determine whether the official intentionally and deliberately committed those acts. For example, in *Roth*, we held that the removal of a mayor and chief of police was improper based on claims that they were "willfully" neglecting to prevent baseball from being played on Sundays when such

---

administration of the office, and [is] restricted to something of a substantial nature directly affecting the rights and interests of the public. The cause must be one touching the qualifications of the officer or his performance of its duties, showing that he is not a fit or proper person to hold the office." (quoting *State ex rel. Hart v. Common Council*, 55 N.W. 118, 120 (Minn. 1893))); *Daugherty v. Day*, 116 S.E.2d 131, 135 (W. Va. 1960)) (holding justification for the removal of a public official includes official misconduct or evil actions in connection with official duties, including "unlawful behavior by a public officer in relation to the duties of his office, willful in character." (quoting *Kesling v. Moore*, 135 S.E. 246, 248 (W. Va. 1926))).

activity may or may not have been illegal on the Sabbath day. 162 Iowa at 651, 144 N.W. at 344. In doing so, we examined the subjective intent of the public officials, noting that the city officials were acting in good faith based on their uncertainty of the law at issue rather than neglecting to enforce it. *Id.*

Further, in *State ex rel. Cochran v. Zeigler*, we held the state failed to demonstrate willful misconduct in office to justify the removal of a mayor based on allegations that the mayor violated the law by having an interest in contracts for goods or services to be furnished or performed for the city. 199 Iowa 392, 397, 202 N.W. 94, 96 (1925). We reached this conclusion based on the lack of evidence in the record "to indicate a corrupt purpose upon the part of [the mayor], or that fraud or imposition was practiced upon the city." *Id.* Moreover, in *State v. Manning*, we held the state failed to show public officials acted willfully to justify their removal for willful and habitual neglect, maladministration, and corruption in office because we could not find a "purpose, on the part of said officials in what they did, to harm, or which was inimical to the interests of such city." 220 Iowa 525, 528, 259 N.W. 213, 215–16 (1935).

Thus, it is not a question of whether a reasonable person would find that the public official acted contrary to his or her duties or even unlawfully. Nor is it a question of how outrageous or inappropriate the public official's conduct is perceived by our court or others in the community. Rather, the first issue before us hinges on the public official's subjective intent to act with a bad or evil purpose to commit his or her charged acts of wrongdoing contrary to a known duty.

In addition to the public official's subjective intent at the time of the charged misconduct or maladministration, we must also discern whether the public official acted contrary to a known duty when he or she engaged

in these acts. *See Roth*, 162 Iowa at 651, 144 N.W. at 344. More specifically, we have held that removal "should be exercised only in cases of official wrongdoing established by clear and satisfactory evidence." *Hospers*, 147 at 714, 126 N.W. at 819. To illustrate, in *Callaway*, we found willful misconduct or maladministration in office to justify removal where a sheriff repeatedly assaulted prisoners without justification by kicking, striking, and punching them, spraying them in the face with mace, and kneeing them in the groin. 268 N.W.2d at 843–47, 848. In reaching this decision, we noted the sheriff's treatment of the prisoners violated various laws, including his legal duty "to protect prisoners from insult and annoyance." *Id.* at 847. Likewise, we found removal was justifiable for willful misconduct or maladministration in office when county supervisors loosely managed funds and falsely claimed payment for mileage that they had not travelled. *Bartz*, 224 N.W.2d at 636, 637–38, 638–39.

Similarly, in *State ex rel. Duckworth v. Smith*, we affirmed the removal of a county treasurer for willful misconduct or maladministration in office after the county treasurer acted alongside a treasurer's office employee to withdraw funds from the county treasurer's office for private purposes. 219 Iowa 5, 7, 257 N.W. 181–82 (1934). In reaching our conclusion, we noted the county treasurer repeatedly took money from the treasurer's office "after he had been told that such action was unlawful" and "after being warned by the state checkers." *Id.* at 7, 257 N.W. at 182. We also looked at the treasurer's knowledge of his own wrongdoing, noting certain actions by the treasurer "seem[ed] to indicate knowledge on [his] part . . . that the abstraction of funds from the treasurer's office was not proper." *Id.* at 6, 257 N.W. at 181.

In summary, to remove a public official from office for willful misconduct or maladministration in office, the State has the burden to prove by clear, convincing, and satisfactory evidence that the official committed the charged acts "intentionally, deliberately, with a [subjectively] bad or evil purpose, contrary to known duty." *Roth*, 162 Iowa at 651, 144 N.W. at 344; *see Smith*, 232 Iowa at 255, 4 N.W.2d at 268.

2. *The definition of sexual harassment in the Iowa Rules of Professional Conduct.* In determining that Watkins committed willful misconduct or maladministration in office through his charged acts, the district court applied the standard for sexual harassment set forth in the Iowa Rules of Professional Conduct rather than the employment law standard for a hostile-work-environment sexual-harassment claim. We have defined the term "sexual harassment" in the context of professional misconduct cases to "include any physical or verbal act of a sexual nature that has no legitimate place in a legal setting." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Moothart*, 860 N.W.2d 598, 604 (Iowa 2015). The standard for sexual harassment established under the rules does not include the necessary analysis of the accused's intent that is required in the removal context to determine whether the accused acted "intentionally, deliberately, with a bad or evil purpose, contrary to a known duty." *Roth*, 162 Iowa at 651, 144 N.W. at 344.

Further, the professional rules "are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies." Iowa R. Prof'l Conduct ch.32, Scope [20]. The "[v]iolation of a Rule should not itself give rise to a cause of action against a lawyer nor should it create any presumption in such a case that a legal duty has been breached." Model Rules Prof'l Conduct Scope [20] (Am. Bar Ass'n 2016); *see also Stender v. Blessum*, 897 N.W.2d 491, 504 (Iowa 2017)

(holding that a violation of the rules of professional conduct "cannot be used to establish a per se claim for legal malpractice"); *Ruden v. Jenk*, 543 N.W.2d 605, 611 (Iowa 1996) (holding the rules of professional conduct do "not undertake to define standards of civil liability"). An additional remedy exists within the attorney disciplinary system for any ethical violations that Watkins committed.

3. *The definition of sexual harassment in employment law.* Employment law recognizes two different forms of sexual harassment under Title VII of the Civil Rights Act and the Iowa Civil Rights Act (ICRA), namely, quid pro quo and hostile or abusive work environment. *See McElroy v. State*, 637 N.W.2d 488, 499 (Iowa 2001); *see also Vivian v. Madison*, 601 N.W.2d 872, 873 (Iowa 1999) ("The ICRA was modeled after Title VII of the United States Civil Rights Act. Iowa courts therefore traditionally turn to federal law for guidance in evaluation the ICRA."). The State alleges Watkins created a hostile or abusive work environment. It does not accuse Watkins of engaging in quid pro quo sexual harassment, so our analysis in this case focuses only on the legal standards governing a sexually hostile work environment.

" 'A hostile work environment is a cumulative phenomenon,' and a series of individual episodes of inappropriate behavior eventually can amount to a hostile environment." *Simon Seeding & Sod, Inc. v. Dubuque Human Rights Comm'n*, 895 N.W.2d 446, 470 (Iowa 2017) (quoting *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 421 (8th Cir. 2010). Hostile-work-environment claims "recognize[] workplace discrimination affects the full spectrum of disparate treatment in the workplace and target[s] discrimination that requires employees to work in a discriminatorily abusive or hostile workplace." *Farmland Foods, Inc. v. Dubuque Human Rights Comm'n*, 672 N.W.2d 733, 743 (Iowa 2003). Such claims are

"actionable when the sexual harassment is so severe or pervasive as to alter the conditions of employment and create an abusive working environment." *McElroy*, 637 N.W.2d at 499.

"The gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.'" *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68, 106 S. Ct. 2399, 2406 (1986) (quoting 29 C.F.R. § 1604.11(a) (1985)). "A recurring point in [the jurisprudence governing sexually hostile work environments] is that 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the" employment conditions to create an abusive work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88, 118 S. Ct. 2275, 2283 (1998) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82, 118 S. Ct. 998, 1003 (1998)). "The correct inquiry is whether [complainant] by her conduct indicated that the alleged sexual advances were unwelcome." *Meritor Sav. Bank*, 477 U.S. at 68, 106 S. Ct. at 2406.

> To establish a hostile work environment, the plaintiff must show: (1) he or she belongs to a protected group; (2) he or she was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic; and (4) the harassment affected a term, condition, or privilege of employment.

*Farmland Foods*, 672 N.W.2d at 744. Such harassment occurs "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* at 743 (alteration in original) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993)). The standards governing a hostile work environment are intended to "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive

language, gender-related jokes, and occasional teasing.' " *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 2415 (2006) (quoting *Faragher*, 524 U.S. at 788, 118 S. Ct. at 2283–84).

Accordingly, the plaintiff must establish that "he or she subjectively perceived the conduct as abusive, [and] that a reasonable person would also find the conduct to be abusive or hostile." *Farmland Foods*, 672 N.W.2d at 744. To determine whether a reasonable person would find the challenged conduct to be abusive or hostile, the fact finder must examine all of the circumstances,

> including: (1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct was physically threatening or humiliating or whether it was merely offensive, and (4) whether the conduct unreasonably interfered with the employee's job performance. These factors and circumstances must disclose that the conduct was severe enough to amount to an alteration of the terms or conditions of employment. Thus, hostile-work-environment claims by their nature involve ongoing and repeated conduct, not isolated events.

*Id.* at 744–45 (citations omitted).

The district court ruling in this case did not actually find the State proved the elements of a hostile-work-environment sexual-harassment claim.

4. *Sufficiency of the evidence to warrant removal.* In determining whether the State has met its burden to remove Watkins from office, the dispositive question is whether the record contains "sufficient evidence of misconduct on the part of [the] defendant[] . . . as [an] elected public official[] to necessitate [his] removal from office under the provisions of Chapter 66." *Bartz*, 224 N.W.2d at 634. We certainly agree that sexual harassment *can* be the basis for removal from office under chapter 66. The applicable legal standard, though, is not that found in the rules of professional conduct or in civil employment law. Rather, it is the standard

found in chapter 66. In this case, the district court did not discuss our precedents interpreting chapter 66 and its precursors.

Instead, the district court focused on three things. First, it emphasized that Watkins repeatedly engaged in "unacceptable behavior." As the district court explained, "[T]he citizens of any county have a strong interest in ensuring that their elected officials behave appropriately." Second, the court noted that Watkins's conduct could create monetary liability for the county. Third, the district court observed that Watkins was an attorney and the Iowa Rules of Professional Conduct prohibit "any physical or verbal act of a sexual nature that has no legitimate place in a legal setting" regardless of whether a sexual-harassment claim is established as defined in the civil rights laws. *Moothart*, 860 N.W.2d at 604.

To be clear, sexual harassment in any form is never acceptable or appropriate behavior. It is important that our court system, like all institutions, protect and support victims of sexual harassment. Watkins's actions and statements were disgraceful, disrespectful, and inappropriate. Certainly, we do not condone such behavior. As morally reprehensible as we find Watkins's behavior, this is not the standard by which we need to analyze whether the State has met its high burden to establish whether Watkins committed willful misconduct or maladministration in office by creating a sexually hostile work environment. We are a court of law, not a court of public opinion. We now analyze the facts of this case and apply the legal standards applicable to removal actions.

Determining whether a public official engaged in willful misconduct or maladministration in office is necessarily fact specific. As already noted, Watkins's conduct did not amount to a criminal violation and the claim that Watkins committed sexual harassment has not been adjudicated. *See*

*City of Des Moines*, 241 Iowa at 262, 41 N.W.2d at 39 ("A proceeding to remove a public officer under this statute is a drastic one and is penal or quasi-criminal in character."). Also, many of the incidents involved situations that occurred outside of the workplace or in the context of Watkins's friendship with certain witnesses rather than in the office or in his official capacity as county attorney. *See, e.g.*, *Hospers*, 147 Iowa at 714, 126 N.W. at 819 (stating removal "should be exercised only in cases of official wrongdoing"). While not excusing Watkins's egregious conduct, the record does not establish that Watkins was guilty of grave misconduct, demonstrated flagrant incompetence, or was otherwise unfit to perform his duties as county attorney. *See Meek*, 148 Iowa at 680, 127 N.W. at 1026 (noting the interests of the public are imperiled when a public official's "administration of the office is marked by such grave misconduct or such flagrant incompetency as demonstrates his unfitness for the position"). Finally, what the State must prove by clear, convincing, and satisfactory evidence is that Watkins committed his charged acts "intentionally, deliberately, with a bad or evil purpose, contrary to known duty." *Roth*, 162 Iowa at 651, 144 N.W. at 344; *see Smith*, 232 Iowa at 255, 4 N.W.2d at 268.

By all accounts, the Law Office of Abraham Watkins/the county attorney's office was an unstructured environment. Wallingford got along well with Watkins and considered herself a close friend to Renee. The individuals in the office teased and played pranks on each other. Watkins, Renee, and Wallingford discussed intimate details of their lives with one another. They socialized with one another on a frequent basis, including at least one or two overnight trips that included the Watkinses' children.

The events that led to Wallingford's resignation began on August 5. It was on that date that Watkins and Renee were in a major verbal fight.

Renee decided to remove herself and the children from the home and visit her family out of state. Alcohol abuse by Watkins was a factor in Renee's decision to leave. By this time, Wallingford was fed up with the tension and arguing in the office by all concerned. But the tipping point for her was an insulting remark that Watkins made to her over the weekend about her father. By Monday evening, Wallingford decided to resign from her position and contacted Kauffman and Barchman regarding her decision. Kauffman advised her at that time to write down all of her complaints about Watkins, which she did the following week.

Of the fifty-plus complaints that Wallingford listed about Watkins, approximately eleven were the incidents of sexual harassment that we have discussed. Significantly, Wallingford acknowledged at trial that when she was referring to a "hostile work environment" in her letter of resignation, she was referring to the yelling and uncomfortableness in the office and not a hostile work environment in the sexual-harassment sense.

Most of the highly inappropriate comments and photographs Watkins needlessly and insensitively subjected Wallingford to did not concern Wallingford herself. In addition, many of the comments were not made during work but in various nonwork contexts such as at an evening dinner at Watkins's home, personal phone calls over the weekend, and at a birthday party for Watkins's daughter.

There is no evidence that Watkins sought to misuse his office or his position of power or authority to obtain anything from Wallingford or anyone else. The testimony reveals that Watkins believed his sexual comments and jokes were made in the context of his personal relationship with Wallingford—because he believed that was the type of relationship they had: one in which they joked, teased, and made sarcastic remarks to one another in the office. He was wrong of course; his comments and

actions crossed way over the line. However, Watkins's state of mind is a relevant consideration in determining his culpability under chapter 66. Another underlying problem was that Watkins used part of the first floor of his home as the county attorney office. This turned out to be a bad arrangement, but it had been approved by the Board.

Based on our close review of the entire record, we are not persuaded that Watkins acted "with a bad or evil purpose, contrary to known duty," which requires more than a showing that Watkins acted intentionally. *Roth,* 162 Iowa at 651, 144 N.W. at 344. Nor are we persuaded that he committed many of the charged acts within the scope of his official responsibilities as the county attorney. *See, e.g., Hospers*, 147 Iowa at 714, 126 N.W. at 819.

Therefore, we must reverse the district court's order removing Watkins from the office of county attorney. The State failed to meet the high burden required to show "by clear, convincing, satisfactory evidence" that Watkins intended to commit willful misconduct or maladministration in office based on the record. *See Smith*, 232 Iowa at 255, 4 N.W.2d at 268. As we have previously held, "[c]onduct may be voluntary, thoughtless, or even reckless, yet not necessarily willful." *Meek*, 148 Iowa at 674, 127 N.W. at 1024. While we agree that Watkins's conduct was voluntary, thoughtless, and offensive, the evidence does not show that he conducted himself in such a way that it was done willfully with an evil purpose.

Again, it is not our function on appeal to judge whether the conduct of Watkins was unprofessional, inappropriate, offensive, or rude. Nor is it for us to determine whether this is behavior we would expect in a private law office, let alone in the office of an elected county attorney. Clearly, we would hope for and expect much better. Our obligation is to follow the law

that requires the State to meet its high burden of proof in removal proceedings to establish Watkins's "willful intent to do wrong [and] an evil purpose upon the part of the accused . . . by clear, convincing, satisfactory evidence." *Smith*, 232 Iowa at 255, 4 N.W.2d at 268. Removal proceedings exist primarily to protect public interests, and those interests are imperiled when a public official's "administration of the office is marked by such grave misconduct or such flagrant incompetency as demonstrates his unfitness for the position." *Meek*, 148 Iowa at 680, 127 N.W. at 1026. The State failed to meet its high burden to demonstrate corruption, negligence, or incompetence warranting the drastic and penal remedy of removal of Watkins from office as the Van Buren County Attorney.

Notably, our decision to reverse the district court removal of Watkins from office

> does not mean that [his] actions . . . are not beyond the reach of the persons [he was] elected to serve. At the next election, [his] actions are subject to review by the electorate. Under the separation-of-powers doctrine, "electoral control [is] an important restraint on [the] conduct [of elected officials]."

*Residential & Agric. Advisory Comm., LLC v. Dyersville City Council*, 888 N.W.2d 24, 51 (Iowa 2016) (Wiggins, J., concurring specially) (fourth alteration in original) (quoting *Teague v. Mosley*, 552 N.W.2d 646, 650 (Iowa 1996)).

In our democratic system of government, it is vitally important that the judiciary not be seen as imposing standards of conduct on elected officials, even if those standards are firmly grounded. We are judges, not guardians of behavior for elected officials. We do not believe the legislature intended to allow courts to remove elected officials for crude, outrageous, or even shocking behavior by itself. Nor do we believe the potential for governmental monetary liability should be the basis for invoking chapter

66. There are many instances where the conduct of public officials exposes the government to financial liability; only a few warrant the drastic remedy of removal. The facts of this case do not warrant such a drastic remedy under our precedent.

Chapter 66 places significant authority in the hands of the judiciary. We must keep in mind the possibility that this authority could be misused in a partisan way to benefit one political faction or one elected official at the expense of another. The judiciary should exercise considerable restraint in such disputes.

In conclusion, based upon our de novo review of the entire record, the evidence did not establish willful misconduct or maladministration in office within the meaning of section 66.1A(2). The State's evidence was insufficient to meet the high bar necessary for the removal of Watkins from his elected office. Consequently, we reverse the judgment of the district court, vacate the district court's order removing Watkins from the office of Van Buren County Attorney, and remand the case for entry of an order dismissing the petition for removal and reinstating Watkins as Van Buren County Attorney.

**C. Watkins's Additional Claims Regarding His Removal.** Due to our decision reversing the district court and vacating the order for removal of Watkins, we need not address Watkins's remaining arguments for reversal.

**D. Attorney's Fees.** Under Iowa Code section 66.23, "[i]f the petition for removal is dismissed, the defendant shall be reimbursed for the reasonable and necessary expenses incurred by the defendant in making a defense, including reasonable attorney's fees, as determined by the court." Iowa Code § 66.23. The district court found that only one of the State's five grounds for removal actually warranted removal and, thus,

denied Watkins's motion for attorney fees. It held that attorney's fees can only be awarded under section 66.23 if the petition is dismissed in its entirety. Since we now decide to vacate Watkins's removal and remand the case to the district court to enter an order dismissing the entirety of the removal petition against him, Watkins is entitled to the reasonable and necessary expenses, including attorney's fees, that he incurred throughout his defense. *See id.* On remand, the district court must determine appropriate attorney's fees.

### IV. Conclusion.

For the aforementioned reasons, we reverse the district court's judgment and vacate its removal order of Watkins from the office of Van Buren County Attorney. We also remand the case for his reinstatement as Van Buren County Attorney, as well as a determination of Watkins's reimbursement for the reasonable attorney's fees and any other reasonable and necessary expenses he incurred throughout his defense of these proceedings.

**REVERSED AND REMANDED WITH INSTRUCTIONS.**

Waterman and Mansfield, JJ., join this opinion. Appel, J., files a special concurrence. Cady, C.J., files a dissenting opinion in which Hecht, J., joins. Wiggins, J., files a dissenting opinion.

**APPEL, Justice (concurring specially).**

If this was an ordinary employment relationship, an employer might well fire Abraham Watkins. But here we are dealing with an elected official. And while the statute itself permits removal as a result of "willful misconduct or maladministration," Iowa Code § 66.1A(2) (2015), these elastic terms have been dramatically narrowed by our caselaw to establish the highest possible requirement for judicial removal.

We have required what amounts to "specific intent" to do wrong in a criminal or quasi-criminal way and the need for heroic action by the court to save the day. "A proceeding to remove a public officer under this statute is a drastic one and is penal or quasi-criminal in character." *City of Des Moines v. Dist. Ct.*, 241 Iowa 256, 262, 41 N.W.2d 36, 39 (1950). "Removal is drastic and penal." *State v. Callaway*, 268 N.W.2d 841, 842 (Iowa 1978). "[T]he remedy . . . is heroic in nature and relatively drastic in a system where the usual method of removing officeholders is by resort to the ballot." *State v. Bartz*, 224 N.W.2d 632, 638 (Iowa 1974).

Yet I view this as a close case. I do not agree with all of Justice Zager's gloss on the facts. In particular, I agree with much of what Chief Justice Cady says about the use of sexual humor to objectify and demean women. I part company with Chief Justice Cady primarily as a result of my view of the extraordinarily demanding standard for removal as articulated in our caselaw and its application to the facts of this case. On the narrow but critical legal issue of the appropriate standard for removal, I am closer to Justice Zager.

Because of my differences with both major opinions in this case, I do not join either of them. In the end, however, I conclude that Watkins's

behavior approaches, but does not cross, the heroic and stringent penal or quasi-criminal standard for removal articulated in our historic caselaw.

I want to make clear that today should not be regarded as a vindication for Watkins. By the narrowest of margins, he has escaped heroic, quasi-penal judicial removal from his office of county attorney. In short, this case should be a model for county attorneys of how *not* to conduct themselves in office.

**CADY, Chief Justice (dissenting).**

I respectfully dissent. Sexual harassment will not end until it is seen as serious enough to end.

Over a century ago, in 1910, a pharmacist from Floyd County named Matye Carragher challenged a law that disqualified female pharmacists from selling intoxicating liquors. *In re Carragher*, 149 Iowa 225, 226, 128 N.W. 352, 352 (1910). We rejected her claim. *Id.* at 228–30, 128 N.W. at 353–54. We rejected it not because we did not strive to do justice, but because we could not see the injustice in her claim. We simply could not see then what is perfectly evident today. Instead, what Matye Carragher saw as discrimination in 1910, we saw as a "natural and reasonable" distinction in life. *Id.* at 229, 128 N.W. at 354. We saw the different gender treatment in the sale of intoxicants, but only as one of many common aspects of a given profession or business in which "individuals of one sex are in general better fitted than those of the other sex." *Id.* at 229–30, 128 N.W. at 354. The injustice seared into that view could not be seen on that day in 1910 because the lens used to judge the facts and examine the claim was the same old lens that had been used in the past. The smudges of the past obscured the injustice now fully visible in hindsight.

The value of the *Carragher* case today is not in its holding, but in the lesson it leaves behind. One of the most important observations that can be drawn from our legal history is justice can only replace injustice when a challenge to the law is examined through the lens of those who have been forced by our law to endure the injustices of our past. Until this is done, the past remains, as does the injustice.

The law governing the removal of public officials from office, the law governing the role of the courts in that process, and the legal framework

governing the identification of sexual harassment in the workplace all support a finding of willful misconduct in this case. While the resolution of this claim ultimately lies in the eye of the beholder, our law long ago opened the door for workplace sexual harassment to be viewed as a ground for removal. Courts must simply see it.

**I. Elected Officials and the Role of the Court.**

The legislature is empowered to create public offices. *Hutton v. State,* 235 Iowa 52, 54, 16 N.W.2d 18, 19 (1944). Pursuant to this authority, the legislature is free to impose qualifications or limitations on officers as it deems expedient. The public's right to have its preferred individual serve in public office is, therefore, necessarily tempered by the legislature's authority to prescribe credentials and grounds for removal. The state's allegiance to the democratic process of elections is not superior to its allegiance to the democratic process of checks and balances established to remove errant elected officials whose conduct demonstrates their disqualification for office.

Over 150 years ago, in the first publication of the Iowa Code, the legislature saw fit to create a safety valve in order to remove certain public officials whose conduct rendered them unworthy of public office. Iowa Code § 397 (1851). Within the title governing election laws and procedures, our legislature has vested the courts with the authority to remove "officers for misfeasance, malfeasance or nonfeasance in office." 1909 Iowa Acts ch. 78. The causes are "not merely penal," as the "grounds for removal" now codified in chapter 66 "go to the question of qualification." *State ex rel. Kirby v. Henderson,* 145 Iowa 657, 662 124 N.W. 767, 769 (Iowa 1910). The grounds for removal therefore do not stand opposed to, but are rather integrated within, the democratic process. The integrity of

Iowa's elections is preserved when the legislature's proclaimed qualifications are enforced.

At issue in this case is whether the record contains sufficient evidence of misconduct to require Abraham Watkins's removal from office under Iowa Code chapter 66. The question is, ultimately, one of qualification. We must decide whether Watkins engaged in "willful misconduct or maladministration in office" such that he acted contrary to his duties as a county attorney and is removable under section 66.1A(2) (2015). Under our system of government, the responsibility to interpret section 66.1A and decide this question lies with this court.

## II. Analytical Framework.

In interpreting the removal provision, we are mindful that the legislature, through chapter 66, sought to "rid the community of . . . corrupt, incapable or unworthy official[s]." *State v. Callaway*, 268 N.W.2d 841, 842 (Iowa 1978) (quoting *State v. Welsh*, 109 Iowa 19, 21, 79 N.W. 369, 370 (1899)). The statute's core purpose "is for the public benefit and to protect the public interest." *City of Des Moines v. Dist. Ct.*, 241 Iowa 256, 263, 41 N.W.2d 36, 39 (1950). The legislature, therefore, imbued the courts with the power to remove certain public officials with the understanding that, with each new generation, the meaning of "misconduct" and "maladministration" will evolve. *Cf. Griffin v. Pate*, 884 N.W.2d 182, 186 (Iowa 2016) ("[T]he meanings of . . . constitutional doctrines are not necessarily static, and [our analysis] instead considers current prevailing standards that draw their 'meaning from the evolving standards . . . that mark the progress of a maturing society.'" (fourth alteration in original) (quoting *Trop v. Dulles*, 356 U.S. 86, 100–01, 78 S. Ct. 590, 598 (1958))).

Accordingly, our analysis must begin with an understanding that, as society matures, so do its standards for worthiness and capability in public office. We are obliged to not only look backward at the historical principles and precedent surrounding section 66.1A, but also to look forward and consider prevailing and evolving standards and expectations of public officials. *Cf. Iowa Supreme Ct. Att'y Disciplinary Bd. v. Deremiah*, 875 N.W.2d 728, 739 (Iowa 2016) ("From time to time we step back and consider whether our approach to sanctions in our cases is generally sufficient to advance the purposes of our ethics rules."). In this assessment, we are aided by our authority to observe legislative facts and use those facts to inform our ruling.[5] We ground our decision not in our own subjective principles, but in an objective review of prior and prevailing notions of misconduct and maladministration.

**III. Removing Public Officials for Willful Misconduct or Maladministration in Office.**

**A. Legislative History of Iowa Code Section 66.1A.** Before Iowa became the twenty-ninth state in the Union in 1846, the legislature promulgated territorial statutes. In 1843, the Revised Statutes of the Territory of Iowa implicitly recognized the ability to remove an elected official from office. *See* Revised Statutes of the Territory of Iowa ch. 160, § 8 (1843) ("That there shall be elected annually, in each and every organized county in this territory, at the general elections, one person to be inspector of weights and measures . . . ."); *id.* ch. 160, § 11 ("That

---

[5]"Legislative facts are 'those which help the tribunal to determine the content of law and policy and to exercise its judgment or discretion in determining what course of action to take.'" *State v. Henze*, 356 N.W.2d 538, 540 n.1 (Iowa 1984) (en banc) (quoting Kenneth Culp Davis, *Judicial Notice*, 55 Colum. L. Rev. 945, 952 (1955)). "[L]egislative facts are not concerned with particular problems of individuals, but involve a determination of what is in the best interests of the public generally." *McMurray v. City Council*, 642 N.W.2d 273, 277 (Iowa 2002).

whenever the inspector of weights and measures mentioned in this act, shall resign or *be removed from office . . . .*" (Emphasis added.)).

Following statehood, the first Iowa Code was published in 1851. Within Title IV, governing "elections, qualifications for office, contested elections, vacancies, etc.," Iowa Code Analysis (1851), the legislature included a provision governing the removal of certain elected officials from office. Iowa Code § 397 (1851). The legislature provided, "All county officers, including justices of the peace, may be charged, tried, and removed from office for official misdemeanors in the manner and for the causing [causes] following: . . . For wilful mal-administration in office." *Id.* (first alteration in original). The legislature later extended the statute to "[a]ll county, township, city and town officers, elected or appointed." Iowa Code § 1251 (1897). As well, the legislature announced that such officers may be removed for "wilful misconduct or maladministration in office." *Id.* § 1251(7).

In 1909, the legislature created a comprehensive removal framework for elected officials. 1909 Iowa Acts ch. 78 (codified at Iowa Code §§ 1258-c to 1258-k (Supp. 1913)). The Act specifically vested the courts with the authority to remove "[a]ny county attorney, sheriff, mayor, police officer, marshal or constable . . . [f]or wilful misconduct or maladministration in office." *Id.* ch. 78, § 1. In 1924, the legislature again broadened the provision, giving the courts the authority to remove "[a]ny appointive or elective officer, except such as may be removed only by impeachment, holding any public office in the state or in any division or municipality thereof . . . [f]or wilful misconduct or maladministration in office." Iowa Code § 1091(2) (1924).

Since 1924, the provision has remained virtually unchanged, although it has been renumbered several times. Today, the provision is codified at section 66.1A and reads as follows:

> Any appointive or elective officer, except such as may be removed only by impeachment, holding any public office in the state or in any division or municipality thereof, may be removed from office by the district court for any of the following reasons:
>
> 1. For willful or habitual neglect or refusal to perform the duties of the office.
>
> 2. For willful misconduct or maladministration in office.
>
> 3. For corruption.
>
> 4. For extortion.
>
> 5. Upon conviction of a felony.
>
> 6. For intoxication, or upon conviction of being intoxicated.
>
> 7. Upon conviction of violating the provisions of chapter 68A.

Iowa Code § 66.1A (2015).

In sum, since Iowa's inception, our legislature has seen fit to supplement its election laws with corresponding measures to remove elected officials for certain types of misconduct. Contrary to the plurality's premise that the judiciary may not "impos[e] standards of conduct on elected officials," the legislature has *always* tasked the courts with removing officials whose conduct demonstrates their disqualification for office. Indeed, for the entirety of Iowa's history, our legislature has instructed that elected officials assume their offices subject to a number of qualifications, including the condition they refrain from willful misconduct and maladministration in office.

**B. Precedent.**

1. *Standard for removal.* Despite section 66.1A's long history, we have scarcely been called to interpret its directives. The most comprehensive analysis of the statute and its purposes comes from three cases decided over a century ago in 1910. First, in *State ex rel. v. Meek*, citizens brought suit to remove the treasurer of Van Buren County, arguing he collected taxes for a number of days beyond the deadline without imposing the statutory late fees. 148 Iowa 671, 672, 127 N.W. 1023, 1024 (1910). When the treasurer at trial admitted he indeed collected such taxes, the court "excluded all evidence tending to show good faith and absence of evil motive." *Id.* On appeal, we considered "whether the acts thus freely admitted constitute 'willful misconduct in office' within the meaning of the statute." *Id.* at 673, 127 N.W. at 1024.

After surveying a number of foreign interpretations of "willful," both in the criminal and official misconduct contexts, we concluded "when willfulness is charged as a ground for removing an officer from his office, his good faith and innocence of intentional wrong is a question upon which he is entitled to be heard in evidence." *Id.* at 679, 127 N.W. at 1026. Further, we explained "the primary purpose of the statute is the protection of public interests," and "those interests are not imperiled by acts of a trifling or unimportant character occasioning no injury." *Id.* at 680, 127 N.W. at 1026. Indeed, "[s]uch peril only arises when [the officer's] administration of the office is marked by such grave misconduct or such flagrant incompetency as demonstrates his unfitness for the position." *Id.* "The very object of this statute is to rid the community of a corrupt, incapable, or unworthy official." *Id.* (quoting *Welsh,* 109 Iowa 21, 79 N.W. 370). The legislature did not intend to remove officers for "technical violations against which an ordinary civil action in damages affords a

complete remedy." *Id.* at 682, 127 N.W. at 1027. Rather, "[t]he essential inquiry is whether the record shows the appellant conclusively and as a matter of law guilty of such willful misconduct in office that public interests require his removal." *Id.* at 684, 127 N.W. at 1027–28.

Second, in *Henderson*, we placed the removal statute in context with the legislature's authority to prescribe qualifications. 145 Iowa at 662–65, 124 N.W. at 769–70. In *Henderson*, the state sought to remove the mayor of the City of Marengo for intoxication. *Id.* at 658, 124 N.W. at 768. We explained, "[T]he act in question is not merely penal. The grounds of removal go to the question of qualification as such qualification shall be indicated by the specified acts of misconduct." *Id.* at 662, 124 N.W.2d at 769. We also explained that although the electors may have found the mayor "to be a man of strong personality and of many commendable qualities[,] . . . the power of selection of the majority in such a case is not absolute. It is subject to the power of the Legislature to prescribe qualifications." *Id.* at 665, 124 N.W. at 770.

Finally, in *State ex rel. Gebrink v. Hospers*, we stressed the severity of removing an elected official from office. 147 Iowa 712, 714, 126 N.W. 818, 819 (1910). In *Hospers*, citizens brought suit to remove a county attorney after a grand jury declined to return an indictment against a corporation that had allegedly engaged in price discrimination. *Id.* at 713, 126 N.W. at 819. Although the citizens were frustrated by the lack of criminal consequences, we explained a prosecutor has

> [a] certain degree of discretion in these respects . . . and unless he abuses it or there is a clear showing of corruption, or negligence, or incompetence in the administration of his office, he is not amenable to proceedings for his removal.

*Id.* at 714, 126 N.W. at 819. Significantly, we explained removing an official "is a very drastic" remedy, as the effect is "not only to deprive an

individual of an office to which he has been regularly chosen, but also to deprive the people of the services of the man whom they have selected for the position." *Id.* Invocation of the statute "should be exercised only in cases of official wrongdoing established by clear and satisfactory evidence." *Id.* However, we also held that the unsuccessful citizens should not be assessed the costs of the proceedings. *Id.* at 715, 126 N.W. at 819. In bringing the suit, the citizens "speak for the public and the law, and the courts take cognizance of their complaints not to remedy their private wrongs, but to conserve public interests." *Id.*

2. *Instances of willful misconduct.* Following the 1910 cases, we repeatedly affirmed that officers shall not be removed unless the alleged misconduct was committed willfully. *See State ex rel. Fletcher v. Naumann,* 213 Iowa 418, 427, 239 N.W. 93, 97 (1931) ("[T]here was no showing that Naumann acted willfully, or that he did anything that would make it necessary . . . to 'rid the community of a corrupt, incapable, and unworthy official[].' ") (quoting *Meek,* 148 Iowa at 680, 127 N.W. at 1026)); *State ex rel. Cash v. Canning,* 206 Iowa 1349, 1353, 221 N.W. 923, 924–25 (1928) ("There can be no condonment of willful misconduct or corruption in office, even though the amount involved may appear to be inconsequential and trivial. Peculation, as a badge of misconduct and corruption, is not to be measured by its extent or grossness. There must, however, be a willful intent to do wrong or a maladministration of office to warrant a summary removal of a public officer."); *State ex rel. Cochran v. Zeigler,* 199 Iowa 392, 396, 202 N.W. 94, 95 (1925) ("The word 'willful,' as used in this connection . . . impl[ies] knowledge on the part of the officer, together with a purpose to do wrong. . . . Not every technical violation of a statute or of official duty will, however, justify the summary removal of the officer." (Citation omitted.)).

Yet, in *State ex rel. Duckworth v. Smith*, we explained the willfulness principles announced in *Naumann, Canning, Zeigler,* and *Meek* do not "require as an essential element of willfulness a greater scienter in the doing of an act than the character of the act permits." 219 Iowa 5, 7, 257 N.W. 181, 182 (1934). In *Smith*, a county treasurer took public funds for his private use more than twenty times, yet claimed the takings were not willful as contemplated by the removal statute. *Id.* at 6–7, 257 N.W. at 181–82. The treasurer believed the county owed him additional salary payments and some of the withdrawals occurred during periods where the treasurer believed he was owed payments. *Id.* at 8, 257 N.W. at 182. We held it to be "beside the point" that "the county may have owed him salary . . . for the salary of the treasurer must be paid on warrants drawn by the county auditor. The treasurer cannot help himself to public funds even in the payment of his salary." *Id.* Indeed, "[w]e [were] at a loss to discover any worthy motive which could have prompted him to take public money for his private use." *Id.* at 7, 257 N.W. at 182. After looking at "[t]he whole picture," we determined the county treasurer's conduct "present[ed] a case in which 'willfulness' must be found to be present." *Id.* at 7–8, 257 N.W. at 182.

In 1974, we concluded removal was justified for three county supervisors. *State v. Bartz*, 224 N.W.2d 632, 639 (Iowa 1974). In *Bartz*, the supervisors (1) accepted gifts and other perks from persons who regularly contracted with the county, (2) maintained loosely managed slush funds instead of depositing all funds with the county treasurer, and (3) submitted mileage claims in significant excess of what was actually driven. *Id.* at 635, 638–39. We explained the State must provide "clear, satisfactory and convincing" evidence that the supervisors committed misconduct "willfully and with an evil purpose." *Id.* at 638. Although the

trial court concluded the supervisors acted "without evil or corrupt motives . . . we reach[ed] an opposite conclusion." *Id.* Our de novo review revealed evidence that proved the supervisors' conduct "fell well below the standards of conduct expected of public officials." *Id.*

Finally, in 1978, we removed a sheriff from office for willful misconduct and maladministration in office. *Callaway*, 268 N.W.2d at 849. In *Callaway*, the state petitioned to remove the Hardin County Sheriff based on five incidents in which he brutalized or otherwise used excessive force against inmates and citizens. *Id.* at 842–46. The sheriff admitted to making a "mistake" in two such incidents, but "defend[ed] his use of force in the other incidents." *Id.* at 847. Thus, the sheriff subjectively believed his force was necessary and not contrary to his duties. We found the sheriff's justification defense "depend[ed] in part upon his credibility," but "also depend[ed] on distorting the standard governing a law enforcement officer's right to use force to make an arrest and restrain a prisoner." *Id.* We not only found the state's witnesses to be more credible, but also determined the sheriff "plainly breached" officer force standards "in the five principle incidents relied on by the State." *Id.* Furthermore, we found the sheriff's subjective intent "distort[ed] the standard governing a law enforcement officer's right to use force to make an arrest and restrain a prisoner." *Id.* at 847. We explained,

> This is not a case of a momentary lapse or of a few mistakes in judgment in routine matters. It is a case of repeated, deliberate brutality to prisoners. The conduct shown here is antithetical to the professionalism which the public requires and generally receives from law enforcement officers. In fact, it contradicts the standards which peace officers have established for themselves.

*Id.* at 848. Thus, because "[t]he authorities uniformly agree[d] that such misconduct by a law enforcement officer is a ground for ouster from office,"

the state met its burden in proving the sheriff "was guilty of willful misconduct in office." *Id.* at 847–48.

Against this backdrop of legislative intent and precedent, we proceed to consider the nature of sexual harassment and whether it falls within the types of misconduct contemplated by section 66.1A.

### IV. Sexual Harassment.

"Without question, when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64, 106 S. Ct. 2399, 2404 (1986) (alteration in original). When Congress enacted Title VII of the Civil Rights Act of 1964, it intended "to strike at the entire spectrum of disparate treatment of men and women." *Id.* (quoting *City of L.A. Dep't of Water & Power v. Manhart*, 435 U.S. 702, 707 n.13, 98 S. Ct. 1370, 1375 n.13 (1978)). Sex discrimination has always encompassed *more* than a threat of economic loss or other tangible adverse employment action. Title VII—and the Iowa Civil Rights Act (ICRA)—"afford[] employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Id.* at 65, 106 S. Ct. at 2405.

" 'A hostile work environment is a cumulative phenomenon,' and a series of individual episodes of inappropriate behavior eventually can amount to a hostile environment." *Simon Seeding & Sod, Inc. v. Dubuque Human Rights Comm'n*, 895 N.W.2d 446, 470 (Iowa 2017) (quoting *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 421 (8th Cir. 2010)). Although "[a] few isolated or sporadic [comments] over a long period of time," do not rise to the level of actionable discrimination, "repeated harassing remarks may be sufficient to establish hostile working environment." *Id.*

The effects of hostile-work-environment discrimination are known and severe. Women who are sexually harassed "feel humiliated, degraded, ashamed, embarrassed, and cheap, as well as angry." Catharine A. MacKinnon, Sexual Harassment of Working Women 47 (1979) [hereinafter MacKinnon]. Women do not "want to be sexually harassed at work. Nor do they, as a rule, find it flattering." *Id.* "Women's confidence in their job performance is often totally shattered," and "[t]hey are left wondering if the praise they received prior to the sexual incident was conditioned by the man's perception of the sexual potential in the relationship." *Id.* at 51. Importantly, "Title VII comes into play before the harassing conduct leads to a nervous breakdown." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22, 114 S. Ct. 367, 370 (1993). Harassment need not "seriously affect employees' psychological well-being" in order to "detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." *Id.* at 22, 114 S. Ct. at 371.

Over time, employers have gleaned that it is no longer permissible to enunciate blatant prejudices in the workplace. However, "these feelings remain under the surface, often taking the form of humor." MacKinnon, at 52 (quoting Eleanor L. Zuckerman, *Masculinity and the Changing Woman, in* E. L. Zuckerman, ed., *Women and Men: Roles, Attitudes and Power Relationships* 65 (1975)). "Humor . . . has been a major form of" sexual harassment's trivialization, and is "a major means through which its invisibility has been enforced." *Id.* Indeed, framing derogatory and discriminatory comments as "jokes" permits courts to characterize the misconduct as merely "crude," rather than discriminatory. Men are just joking, and women should lighten up.

Sexual harassment of an employee and, therefore, discrimination against an employee on the basis of sex, is no mere "technical violation[]."

*Meek,* 148 Iowa at 682, 127 N.W. at 1027. Consistent state and congressional efforts to eradicate and punish sexual harassment establish society's firm disavowal of this type of misconduct in the workplace. In 1991, Congress amended Title VII to allow successful sexual harassment plaintiffs to recover punitive damages. Civil Rights Act of 1991, Pub. L. No. 102–166, § 1, 105 Stat. 1071, 1071 (1991) (finding "additional remedies under Federal law are needed to deter unlawful harassment and intentional discrimination in the workplace"). In 1992, two years after this court recognized a sexual harassment cause of action under the Iowa Civil Rights Act, *see Lynch v. City of Des Moines,* 454 N.W.2d 827, 833 (Iowa 1990), the Iowa legislature specifically acted to prohibit the sexual harassment of state employees. *See* 1992 Iowa Acts ch. 1086, § 2 (codified at Iowa Code § 2.11 (1993)) (commanding each house of the general assembly to implement sexual harassment training and grievance procedures); *id.* § 3 (codified at Iowa Code § 19B.12) (expressly barring state employees from engaging in quid pro quo and hostile work environment harassment).

Today, lawmakers continue to emphasize that sexual misconduct has no place in government offices. In October and November of 2017, both the United States House of Representatives and Senate introduced measures to combat sexual harassment in government offices. Congressional Sexual Harassment Training Act, H.R. 4155, 115th Congress (2017); STOP Sexual Harassment Resolution, S. Res. 323, 115th Congress (2017). Across the country, state legislatures have continued to adopt resolutions and enact policies that target and punish harassment

in public offices.[6]  In the private sector, professional associations across all disciplines have proffered "zero tolerance" policies aimed at eradicating sexual harassment in their respective fields.[7]

---

[6]*See, e.g.*, S.R. 51, Reg. Sess. 2018 (Ala. 2018) (adopting a legislative policy on sexual harassment); H.R. 18–1005, Seventy-first Gen. Assemb., 2d Reg. Sess. (Colo. 2018) (expelling a state representative for violating legislative sexual harassment policy); H.R. 21, 149th Gen. Assemb. (Del. 2018) (adopting a legislative policy on sexual harassment); H.B. 973, 2017–2018 Reg. Sess. (Ga. 2018) (extending legislative sexual harassment policy to registered lobbyists); H.R. 687, 100th Gen. Assemb. (Ill. 2017) (creating a sexual harassment task force); H.B. 1309, 120th Gen. Assemb., 2d Reg. Sess. (Ind. 2018) (requiring annual sexual harassment training for members of the general assembly); H.B. 524, 2018 Reg. Sess. (La. 2018) (enacting sexual harassment policy for all public officers and employees); H. 3983, 190th Gen. Ct. (Mass. 2017) (ordering comprehensive review of all House of Representatives sexual harassment policies); S. 2262, 190th Gen. Ct. (Mass. 2017) (ordering comprehensive review of all Senate sexual harassment policies); H.R. 7678, 2018 Gen. Assemb. (R.I. 2018) (creating a special legislative commission to study sexual harassment); H.R. 5, 2017–2018 Leg. Sess. (Vt. 2017) (establishing a sexual harassment prevention panel to review complaints against members of the House); H.B. 371, 2018 Reg. Sess. (Va. 2018) (requiring all legislative branch employees to complete sexual harassment training every two years); H.B. 2759, 65th Leg., 2018 Reg. Sess. (Wash. 2018) (establishing the Washington state women's commission and ordering the review of sexual harassment policies).

[7]*See, e.g.*, ACS Governing Documents, at 51 (Am. Chem. Soc'y 2018) ("Harassment of any kind, including but not limited to unwelcome sexual advances, requests for sexual favors, and other verbal or physical harassment will not be tolerated."); Appendix 3.2: Policy on Prof'l Conduct & Prohibition Against Harassment (Am. Dental Ass'n) ("The ADA absolutely prohibits sexual harassment . . . ."); Code of Prof'l Conduct r. 1.400.010 (Am. Inst. of Certified Pub. Accountants 2016) ("A *member* would be presumed to have committed an act discreditable to the profession . . . if a final determination . . . is made by a court . . . that a *member* has violated any antidiscrimination laws . . . including those related to sexual and other forms of harassment."); Am. Med. Ass'n Code of Med. Ethics Op. 9.1.3 ("Sexual harassment in the practice of medicine is unethical. . . .  Physicians should promote and adhere to strict sexual harassment policies in medical workplaces."); ANA Position Statement: Sexual Harassment (Am. Nurses Ass'n 1993) ("ANA believes that nurses and students of nursing have a right to and responsibility for a workplace free of sexual harassment."); Code of Ethics Canon 8 (Am. Soc'y of Civil Eng'rs 2017) ("Engineers shall not engage in discrimination or harassment in connection with their professional activities."); Code of Ethics Statement (Event Serv. Prof'ls Assoc.) ("We will not engage in or condone any form of harassment or discrimination."); IEEE Polices § 9.26 (Inst. of Elec. & Elecs. Eng'rs 2018) (prohibiting "[d]iscrimination, [h]arassment and [b]ullying against any person for any reason, for example, because of . . . gender"); Model Rules of Prof'l Conduct r. 8.4(g) (Am. Bar Ass'n 2016) ("It is professional misconduct for a lawyer to . . . engage in conduct that the lawyer knows or reasonably should know is harassment or discrimination on the basis of . . . sex . . . ."); Code of Conduct & Sexual Harassment Policy (Nat'l Ass'n of Realtors) ("The National Association fully supports the rights and opportunities of all its . . . members and employees to work in an environment free from discrimination and without subjugation to sexual harassment.").

Employment discrimination statutes and private sexual harassment policies represent a collective decision that all persons, regardless of age, gender, race, religion, disability, etc., deserve to live dignified, autonomous lives. Title VII and the ICRA are not workplace codes of conduct or matters of "public opinion"—they are necessary vehicles for social and economic mobility. When women are subjected to hostile work environments, they are invariably forced to make a decision between unemployment and intolerable working conditions. When women must move from one job to the next, seeking a workplace ambiance free from discriminatory insult, they are prevented from saving for retirement or their children's college educations. They have inconsistent access to healthcare for themselves and their families. When women must continually start anew with new companies, they are prevented from moving up the ranks and attaining positions of authority. Beyond the dignitary harms suffered, when sexual harassment is allowed to endure, women must work harder to stay afloat while men grow and advance in status.

Sexual harassment was once a putative consequence of working while female. However, legislative enactments, private measures, and public discourse conclusively demonstrate that society has evolved. Sexual misconduct in the workplace, especially in a government workplace, is no longer tolerated. County employees, like all other employees, have a statutory and constitutional right to be free from discrimination. It is in the image of this clear, ubiquitous public interest that we ground our understanding of misconduct and maladministration in office. Yet, in the end, it is left to the courts to recognize sexual harassment and apply the law to remove it in all aspects of life.

**V. Application.**

**A. Misconduct.** The unvarnished record reveals the depth of the abhorrent conduct at the center of this case. This conduct occurred in the presence of those who worked in the office of a public official and those who entered the office for business.

At trial, five people testified to observing Watkins in the office in his underwear on different occasions. These people not only included Jasmin Wallingford, the office legal assistant, but also two women who cleaned the office and a client and his wife who had stopped into the office one morning to pick up documents. The two women who cleaned the office were Amish and had once confronted Watkins about being uncomfortable with seeing him in his underwear in the office.

Wallingford, who was twenty-years-old, was the target of most of the conduct at issue. Watkins once showed Wallingford a video he had recorded of his wife squirting breastmilk in Wallingford's car. On another occasion, he showed Wallingford a photograph of his wife's vagina, as well as a photograph of his wife naked from the waist down. Watkins also kept naked photographs of his wife on his desk computer and would look at them during office hours. Virginia Barchman, the assistant county attorney, entered his office on one occasion to speak with him and observed one of the photographs on his computer screen.

Watkins inquired into Wallingford's doctor appointments and asked her on three or four occasions if "her vagina was still broke." Watkins told Wallingford, during work, that her "boobs [were] distracting him" and that she "should wear that shirt out" if she "ever went clubbing." Watkins complained to Wallingford that his wife never wanted to have sex and that he "just wished that he had a wife that had sex with him all the time." Watkins informed Wallingford that he kept naked pictures of former

girlfriends on his phone and enjoyed looking at them. Watkins made a sexually driven reference about a floor cleaner called "Bona" in the presence of Wallingford and the young Amish women who cleaned the office.

Watkins also used sexually graphic and demeaning rhetoric in the workplace when discussing other women. On one occasion, after Watkins made an inappropriate comment at a birthday party, he told Wallingford the following Monday during work that he needed to see if this courthouse employee "wore a padded bra or if her boobs were really that big." On another occasion, Watkins announced that a local female attorney with initials "T.Q." should be referred to as "T. Queef," which refers to a term that describes the emission of air from the vagina.

Just as all of this evidence was necessarily filtered through the lens of those who witnessed it, it again becomes filtered through the lens of those who judge it. For the plurality, its perspective is not so much affected by what it saw in the evidence, as by what it saw as absent from the evidence. It saw crudities, but it also saw a workplace environment in which Wallingford's job was not conditioned on fulfilling Watkins's sexual gratification. It saw the vulgarities in Watkins's conduct, but it also saw an absence of quid pro quo sexual harassment. It saw vulgarities, but looked and could not find an employer who misused "his office or his position of power or authority to obtain anything from Wallingford." Furthermore, it saw the workplace rhetoric by Watkins as "insensitive," but rhetoric that "did not concern Wallingford herself." It saw Watkins as "insensitive," but saw Wallingford as having more reasons for disliking her workplace environment than just the rhetoric and conduct engaged in by Watkins.

The filter used by the plurality narrows the definition of sexual harassment, and in turn, misconduct, and fails to understand sexual harassment from the perspective of the victim. What the plurality does not see through its lens is that the misuse of a position of power or authority does not require quid pro quo conduct. Power and authority are equally exploited when they are used to create a workplace environment riddled with discriminatory insults. What, if not power, could embolden an employer to entirely disregard fundamental boundaries and discriminate on the basis of sex with no consideration for the consequences?

Sexual harassment in the workplace will not be eliminated until it is first understood for what it is. It is not so much "an issue of right and wrong [as] an issue of power." MacKinnon, at 173. The fundamental problem is not the content of workplace conversation, but how sexually explicit rhetoric is used in the workplace by those in power at the expense of others. *Id.* An employer who "[seeks] to misuse his office or his position of power or authority to obtain" something from an employee certainly harms the employee, but an employee is equally aggrieved by a workplace dominated by derogatory slights.

Likewise, a lens that sees sexual comments or "jokes" not specifically directed at the employee herself as "insensitive" but tolerable trivializes the lived experiences of those who have been forced to withstand them. Indeed, a finding that Watkins's comments "did not concern Wallingford herself" rests on a defunct and antiquated view of hostile work environments. Watkins was speaking about women. He was commenting on the bodies of women. He was objectifying and sexualizing women. Wallingford was required to endure a slew of degradations directed solely at women—a class of which she is a member.

Lastly, Wallingford may well have had other reasons for disliking her work environment *on top of* Watkins's harassment, but those reasons do not *negate* the severity of Watkins's behavior. Employees need not refrain from complaining about other frustrating behaviors in order for a court to take a sexual harassment complaint seriously.

In the end, Watkins's misconduct amounted to a hostile work environment when viewed through a lens that sees the complete picture. He consistently, over the course of months, made unwelcome and sexually charged comments to Wallingford and in her presence and engaged in misconduct in office.

**B.  Willful.**  The state of mind or willfulness behind conduct can be difficult to see.  As with defining misconduct, it often depends on a measured view of all the facts and circumstances surrounding the conduct. *See Nelson v. James H. Knight DDS, P.C.*, 834 N.W.2d 64, 79–80 (Iowa 2013) (Cady, C.J., concurring specially) (finding the specific, personal relationship between an employer and employee animated an adverse employment action, rather than actionable discrimination).

At the outset, no evidence exists in the record to support Watkins's belief that his rhetoric and conduct were welcome or appropriate in the workplace.  Wallingford never commented on Watkins's anatomy or made unsolicited, sexually charged comments.  Although Watkins characterizes his law office as one of joking and familiarity, Wallingford's contribution to that atmosphere was vastly different and consisted of such conduct as wearing a funny wig on April Fools' Day and once taping an air horn to Watkins's chair.  Accordingly, any view that Watkins' comments were part of an established atmosphere has no support in the record.  Likewise, the complete and utter one-sidedness of the degrading rhetoric erodes any inference that Watkins's harassment was not willful.

Overall, the plurality relies on various common responses to claims of sexual harassment in the workplace to support its finding that the conduct and rhetoric of Watkins was not willful. It observed that Watkins's conduct did not constitute a crime. It could not find any caselaw that found willful misconduct under similar facts. It saw the conduct engaged in by Watkins to be his personality and not directed at the attributes of Wallingford as a person. It saw a workplace that allowed Watkins to feel comfortable to engage in such conduct and a workplace in which Wallingford felt comfortable to engage in nonsexual humor from time to time.

The lens used to reach the plurality's decision did not observe or factor in the powerful dynamics of employer authority and control over a subordinate in the workplace. It did not see that Wallingford hoped to be a lawyer or her hope that a position in a law office and a positive association with a county attorney would help advance her goal of attending law school. It did not see how Watkins's clout informed Wallingford's desire to maintain a friendship with Watkins and his wife, as a poor relationship could have lasting consequences for her professional career in a county with just over 7000 people. It did not see how the dynamics of subordinates can minimize employer misconduct and perpetuate sexual harassment in the workplace.

Watkins concedes he did not misspeak, nor was he naïve to the sexual connotations of his comments. Indeed, testimony demonstrates he was aware of the inappropriate nature of his comments to employees. Watkins' former child-care worker, Tayt Waibel, testified she once had missed a phone call from Watkins while she was in the shower. She returned his call and explained why she did not answer. In response, Watkins told Waibel she should have FaceTimed him while she was in the

shower. Watkins then stated, "[T]his is probably why I'm in trouble for sexual harassment."

In *Callaway*, we found the sheriff's view that his force was justified depend[ed] in part upon his credibility," but "also depend[ed] on distorting the standard governing a law enforcement officer's right to use force to make an arrest and restrain a prisoner." 268 N.W.2d at 847. Here, Watkins's position similarly depends in part on his credibility. Watkins's admission to Waibel undermines his testimony that his behavior was innocent and reasonable.

Moreover, in *Callaway*, we looked to several sources governing an officer[']s duty to refrain from excessive force. *Id.* at 847–48. We noted the common law standard found in a prominent legal encyclopedia, *see* 6A C.J.S. Arrest § 49, the statutory standard, *see* Iowa Code § 755.2 (1975), and the Law Enforcement Code of Ethics, *see* Louis B. Schwartz & Stephen R. Goldstein, Law Enforcement Handbook for Police 48 (1970). *Callaway*, 268 N.W.2d at 847–48. We charged the sheriff with knowledge of these standards and determined his consistent deviation from them amounted to a willful abdication of his duties as a law enforcement officer. *Id.* Here, Watkins is charged with being aware of the standards governing his conduct as a public official and employer. The rules of professional conduct expressly prohibit attorneys from engaging in sexual harassment. Iowa R. Prof'l Conduct 32:8.4(g). The ICRA and Title VII prevent all employers, including state employers, from engaging in hostile work environment harassment. Iowa Code § 216.6(1)(*a*) (2015); 42 U.S.C. § 2000e-2(a)(1) (2012). As in *Callaway*, Watkins is charged with knowledge of these standards, and his consistent deviation from them is evidence of a willful abdication of his duties as an officer and employer.

Watkins repeatedly, and knowingly, made sexually charged comments to his employees and created a hostile work environment. Despite Watkins's consistent and intentional deviation from the governing standards, the plurality nevertheless concludes he did not act with an "evil purpose" when harassing Wallingford.

What benign intent is consistent with harassment? The plurality requires a "greater scienter in the doing of an act than the character of the act permits." *Smith*, 219 Iowa at 7, 257 N.W. at 182. Harassment, by its nature, is not done benevolently or innocuously. It requires more than an occasional aberration or momentary lapse in judgment. Harassment exists when an employer repeatedly, over the course of time, acts with such disregard that it alters the conditions of employment.

When Watkins told Wallingford that her breasts were distracting him, the plurality saw an innocent intention. When Watkins repeatedly entered the workplace in his underwear, when his bedroom and a restroom were located upstairs, the plurality saw an "unstructured environment." When Watkins told Wallingford, during work hours, that he wondered whether the courthouse clerk's breasts "were really that big," the plurality saw a plausible blunder. When the character of Watkins's misconduct over the entire term of Wallingford's employment "presents a case in which 'willfulness' must be found to be present," the plurality ultimately found no knowledge of wrongdoing. *Smith*, 219 Iowa at 7–8, 257 N.W. at 182.

It is, of course, not always easy to step outside of oneself and see bias when none was intended or see injustice when the opposite was envisioned. But such is the nature of an evolving society in which standards of conduct once decreed as "natural and reasonable" are now understood to be insidious and arbitrary. *Carragher*, 149 Iowa at 229, 128 N.W. at 354. There are times when such a failure of perspective may be

viewed with generosity in hindsight, but today's opinion is not such an instance.

The recognition and prohibition of sexual harassment is far from a recent revelation. It has long been understood that making unsolicited comments about the breasts of an employee is illegal and degrading. That showing a photograph of your naked wife and of her vagina to an employee is unlawful and demeaning. Today's decision is intimately tied to a bygone era of law that shielded men who knew better, at the expense of their female employees, who were required to abandon their jobs or forced to accept harassment as a condition of employment.

While the plurality sees itself as upholding the integrity of elections, such a view weakens the checks and balances of government. The very purpose of the removal statute is to undo an election. Moreover, the opinion reveals the enduring vestiges of de jure discrimination. We were able to see with clarity in 1978 that no sheriff could possibly believe that brutalizing a prisoner is permissible, yet still cannot see with clarity today that no employer could possibly believe that creating a workplace atmosphere defined by degrading women is permissible. One view is not less serious than the other. Both are but different forms of willful misconduct. It is time for but one view to exist. The prolonged period of societal disinterest in the plight of working women must no longer obscure how inappropriate comments about one woman unquestionably concerns all women in the workplace.

Watkins's conduct was more than "inappropriate" and "disrespectful"—it was discriminatory. He deliberately subjected Wallingford to a barrage of indignities directed solely at women. An officer who intentionally discriminates on the basis of sex commits grave misconduct in office and is removable under section 661.A.

Hecht, J., joins this dissent.

**WIGGINS, Justice (dissenting).**

A majority of the members of this court holds the allegations of sexual harassment do not amount to "willful misconduct or maladministration in office" warranting removal. I disagree with this conclusion and must dissent. I would find the State provided sufficient evidence to show willful misconduct on the part of Abraham Watkins. My starting point is the statute.

### I. Iowa Code Section 66.1A(2).

This case turns on the proper interpretation of Iowa Code section 66.1A(2). This section provides,

> Any appointive or elective officer, except such as may be removed only by impeachment, holding any public office in the state or in any division or municipality thereof, may be removed from office by the district court for any of the following reasons:
>
> . . . .
>
> 2. For willful misconduct or maladministration in office.

Iowa Code § 66.1A(2) (2015).

We defined the phrase "willful misconduct or maladministration in office" in *State v. Callaway*, 268 N.W.2d 841, 842 (Iowa 1978). In defining the phrase, we said,

> In order to establish "willful misconduct" as a ground for removal, it is necessary to show a breach of duty committed knowingly and with a purpose to do wrong. This requires proof of grave misconduct. Of course, such misconduct would also be "maladministration in office" within the meaning of [section 66.1A(2)].

*Id.* (citations omitted).

**II. Types of Sexual Harassment: Quid Pro Quo and Hostile Work Environment.**

Our laws prohibit sexual discrimination. *E.g.,* Iowa Code § 216.6(1)(*a*). The plurality correctly points out the law prohibits two types of sexual discrimination in the form of sexual harassment—quid pro quo and hostile work environment. *See McElroy v. State,* 637 N.W.2d 488, 499 (Iowa 2001); *see also Vivian v. Madison,* 601 N.W.2d 872, 873 (Iowa 1999) (stating the legislature modeled the Iowa Civil Rights Act after Title VII of the United States Civil Rights Act); *Lynch v. City of Des Moines,* 454 N.W.2d 827, 833 (Iowa 1990) (holding that sexually hostile work environment is illegal sex discrimination pursuant to the Iowa Civil Rights Act). The former is a "type of harassment [that] is linked to the grant or denial of tangible aspects of employment." *McElroy,* 637 N.W.2d at 499. The latter involves "sexual harassment [that] is so 'severe or pervasive [as] "to alter the conditions of [the victim's] employment and create an abusive working environment." ' " *Id.* (third alteration in original) (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S. Ct. 2399, 2405 (1986)).

Although the plurality recognizes the two types of sexual harassment, it downplays the detrimental effects of hostile work environment. In fact, the plurality reasons the record does not show that Watkins sought to misuse his authority as county attorney to obtain sexual favors from Jasmin Wallingford or anyone else. Had Watkins offered any one of these women advancement in return for sexual favors—a classic quid pro quo situation, even if he made such an offer outside the workplace—I am confident the plurality would decide this case differently. Certainly, hostile work environment may be more subtle than quid pro quo. Subtleness, however, does not necessarily minimize the inimical

impact of sexual harassment on victims. In other words, hostile work environment is not a lesser form of sexual harassment.

We have stated, "A hostile work environment claim is premised on the concept that sexual harassment can impact the conditions of employment *well beyond the denial or granting of economic or tangible benefits.*" *Id.* (emphasis added). Thus, quid pro quo involves a narrow sliver of the types of employment conditions that sexual harassment adversely affects. The plurality should not give more weight to this narrow sliver by de-emphasizing the severity of other adverse alterations of employment conditions, such as noncontractual consequences. "[W]hen an employer creates a hostile work environment, employees are forced to 'run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living . . . .'" *Id.* (second alteration in original) (quoting *Meritor Sav. Bank*, 477 U.S. at 67, 106 S. Ct. at 2405). "[T]he employee must endure an unreasonably offensive environment or quit working." *Id.* at 499–500.

I cannot stress enough that sexual harassment, in whatever form it manifests, detrimentally affects victims. *See* Lucetta Pope, *Everything You Ever Wanted to Know About Sexual Harassment but Were Too Politically Correct to Ask (or, the Use and Abuse of 'But For' Analysis in Sexual Harassment Law Under Title VII)*, 30 Sw. U. L. Rev. 253, 259 (2001) [hereinafter Pope] ("[D]ifferent forms of sexual harassment also produce the same effect."). Catharine A. MacKinnon, a prominent legal theorist, traced the impact of sexual harassment. Catharine A. MacKinnon, *Sexual Harassment of Working Women: A Case of Sex Discrimination* 47–55 (1979) [hereinafter MacKinnon]. She stated, "Like women who are raped, sexually harassed women feel humiliated, degraded, ashamed, embarrassed, and cheap, as well as angry." *Id.* at 47. She further asserted, "Faced with the

spectre of unemployment, discrimination in the job market, and a good possibility of repeated incidents elsewhere, women usually try to endure." *Id.* at 52. However, "the costs of endurance can be very high, including physical as well as psychological damage" from anxiety to all kinds of nervous tics which are "the inevitable backlash of the human body in response to intolerable stress." *Id.* (quoting Special Disadvantages of Women in Male-Dominated Work Settings 6, *in* Women in Blue-Collar, Service and Clerical Occupantions: Hearings Before the Comm'n on Human Rights of the City of N.Y. (1979) (testimony of Lin Farley)).

Sexual harassment, as a broad category including both quid pro quo and hostile work environment, "has devastating effects on a woman's economic and employment opportunities" and "tends to be equally disastrous to a woman's physical health and psychological well-being." Jennifer L. Vinciguerra, Note, *The Present State of Sexual Harassment Law: Perpetuating Post Traumatic Stress Disorder in Sexually Harassed Women*, 42 Clev. St. L. Rev. 301, 305–06 (1994) (footnotes omitted). In fact, "[p]ost [t]raumatic [s]tress [d]isorder is a common result in women who have suffered sexual harassment in the workplace." *Id.* at 303 & n.18 (collecting cases).

Moreover, in *Meritor Savings Bank*, the United States Supreme Court established that both types of sexual harassment—quid pro quo and hostile work environment—are *equally illegal* and actionable under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a). *See* 477 U.S. at 63–67, 106 S. Ct. at 2404–05. I do not believe quid pro quo is worse than hostile work environment. Rather, both types of sexual harassment are two sides of the same coin,[8] and the plurality should give each type its

---

[8]It should be noted that hostile work environment is "[l]ess clear[] and undoubtedly more pervasive" than quid pro quo. MacKinnon, at 40.

due weight. *See* Pope, 30 Sw. U. L. Rev. at 258–59 ("[Q]uid pro quo and hostile environment claims amount merely to alternative varieties . . . . MacKinnon's scheme of quid pro quo and hostile environment claims followed the radical view that seemingly diverse forms of sexual harassment spring from the same discriminatory intent." (Footnote omitted.)).

Hostile-work-environment claims may lead to the same result as quid pro quo claims: the loss of a job. Specifically, a hostile work environment affects an employee's tangible job conditions when it results in the employee's constructive discharge. U.S. Equal Emp. Opportunity Comm'n, N-915-050, *Policy Guidance on Current Issues of Sexual Harassment* (1990), https://www.eeoc.gov/policy/docs/currentissues.html (last modified June 21, 1999). Constructive discharge involves an employee's resignation because his or her working conditions have become "so intolerable that a reasonable person would have felt compelled to resign." *Pa. State Police v. Suders*, 542 U.S. 129, 147, 124 S. Ct. 2342, 2354 (2004).

### III. Willful Misconduct.

**A. Misconduct.** In another effort to lessen the magnitude of Watkins's willful misconduct, the plurality reasons a number of the incidents and comments occurred outside of the workplace because Wallingford was a close family friend who frequently engaged in social activities with Watkins and his wife. Although not all interactions with supervisors or coworkers far away from the water cooler may constitute grounds for a sexual-harassment claim, employers may very well be liable for sexual harassment outside of the workplace.

In *Parrish,* the United States District Court for the Southern District of New York stated,

> The court is aware of no settled law that . . . allow[s] a harasser to pick and choose the venue for his assaults so as to not account for those that occur physically outside the workplace. The employment relationship cannot be so finely and facilely parsed. It comprises multiple dimensions of time and place that cannot be mechanically confined within the precise clockwork and four walls of the office. The proper focus of sexual harassment jurisprudence is not on any particular point in time or coordinate location that rigidly affixes the employment relationship, but on the manifest conduct associated with it, on whether the employer has created a hostile or abusive "work environment," or a "workplace" where sexual offenses occur and are sufficiently severe or pervasive to alter the victim's terms and conditions of employment wherever the employment relationship reasonably carries.

*Parrish v. Sollecito*, 249 F. Supp. 2d 342, 350–51 (S.D.N.Y. 2003).

The court acknowledged, "[A]s a practical matter[,] an employment relationship and the employee's corresponding status, while generally commencing and grounded in what constitutes the office or plant, often carries beyond the work station's physical bounds and regular hours." *Id.* at 351. Moreover, the court noted employees travel on the road for business trips and interact "at business-related meals and social events." *Id.* The court also noted "they may encounter one another in *external contexts not strictly stemming from or compelled by a business purpose.*" *Id.* (emphasis added). The real focus, the court reasoned, should be "the degree to which, wherever a sexual assault occurs, its consequences may be felt in the victim's 'workplace' or 'work environment' and be brought to bear on her terms and conditions of employment." *Id.* I agree with the *Parrish* court's holistic approach.

In our modern times, technological forms of communication, such as texting, take incidents at the water cooler to locations beyond the office. Behaviors outside of the workplace may very well seep into the environment at the workplace, contributing to a hostile work environment.

Wouldn't a victim whose supervisor subjects her to harassment over the weekend feel uncomfortable, anxious, and fearful of her supervisor when she sees him back at work on Monday? I would answer yes.

Additionally, the plurality discounts the district court's use of the Iowa Rules of Professional Conduct. I again disagree. In deciding these removal cases, we have used the Law Enforcement Code of Ethics to support the removal of a sheriff from office. *See Callaway*, 268 N.W.2d at 848. Similarly, a breach of the Iowa Rules of Professional Conduct is relevant in deciding whether Watkins engaged in misconduct.

Furthermore, I find Watkins violated the Restatement (Third) of the Law Governing Lawyers § 56, at 416 (Am. Law Inst. 2000). It provides, "[A] lawyer is subject to liability to a client or nonclient when a nonlawyer would be in similar circumstances." *Id.* Comment *k* to section 56 states, "*Employees of lawyers.* A lawyer who hires a lawyer or nonlawyer as an employee is subject to applicable law governing the employment relationship, such as contract law, antidiscrimination legislation, unjust-discharge law, and labor relations law." *Id.* § 56 cmt. *k*, at 420–21.

To dilute even further the gravity of Watkins's sexual harassment of Wallingford, the plurality states that most of Watkins's repugnant behavior did not concern Wallingford herself. Yet the acts of spewing abhorrent comments about other women and showing nude photographs of his wife to Wallingford constitute sexual harassment targeted at Wallingford. Would Wallingford feel any less of a victim simply because, after seeing an overweight woman, Watkins told Wallingford, "Man, I wouldn't want to see her naked"? Or when Watkins commented to Wallingford about a courthouse employee's breasts and wondered if they were "really that big"? Or when Watkins complained to Wallingford that his wife "never wanted to have sex" and he wished his wife would want to have sex all the time?

Or when Watkins told Wallingford he was glad he kept nude photographs of his previous girlfriends? Wallingford is no less a victim of sexual harassment simply because the comments and photographs did not concern herself in the most literal sense.

Let us not forget the comments concerning Wallingford herself. For example, on three or four occasions, Watkins asked Wallingford if "her vagina was still broke."

Under this record, I would affirm the district court's finding that Watkins committed misconduct in office by establishing and maintaining a hostile work environment.

**B. Willful.** Having determined Watkins committed misconduct, the next question is whether Watkins committed the misconduct willfully. I agree with Chief Justice Cady's analysis of the willful nature of Watkins's misconduct.

We have defined "willful" in the context of section 66.1A(2) to be misconduct "committed knowingly and with a purpose to do wrong." *Callaway*, 268 N.W.2d at 842. The repeated nature of the misconduct in question here requires me to find that Watkins engaged in it knowingly.

Moreover, at least one comment provides direct evidence that Watkins knew exactly what he was doing. When his former child-care worker returned his missed phone call and explained she was in the shower, Watkins told her that she should have FaceTimed him while in the shower and then stated, "[T]his is probably why I'm in trouble for sexual harassment." This statement clearly shows Watkins had the requisite knowledge that he was engaging in sexual harassment. Watkins was not naïve. I doubt his other comments and actions of similar nature came from mere thoughtlessness or even recklessness. *See State ex rel. Barker v. Meek*, 148 Iowa 671, 674, 127 N.W. 1023, 1024 (1910) ("Conduct

may be voluntary, thoughtless, or even reckless, yet not necessarily willful.").

Additionally, I find Watkins engaged in such misconduct for a bad or evil purpose. *See State v. Roth*, 162 Iowa 638, 651, 144 N.W. 339, 344 (1913) (stating "willfully" means the public official acted "intentionally, deliberately, with a bad or evil purpose, contrary to known duty"). He did not mean his misconduct or words to be funny. The nature of his misconduct and words were hurtful to the recipients. It is okay to make jokes but not about other people or their problems. Our law has no room to accommodate Watkins's willful, sexually degrading, demoralizing, and reprehensible behavior.

I find no merit in the rationale the plurality uses to corroborate its conclusion that Watkins did not act with a bad or evil purpose. What I find particularly preposterous is the plurality's unwarranted dilution of Watkins's harassing behavior because the environment included joking, teasing, and sarcastic remarks. I am disinclined to believe any reasonable person in a similar situation would find Watkins's harassment even remotely amusing. I am also disinclined to believe Watkins subjectively believed he meant no harm. The reasoning the plurality uses to discount Watkins's misconduct sounds to me like the good-old-boy excuse. This excuse has absolutely no place in our law.

I also find no merit in the plurality's emphasis on Wallingford's close relationship with Watkins and his wife, as if to excuse Watkins's behavior simply because he was like family to Wallingford. The plurality's sympathetic portrayal of Watkins as a close family friend who meant no harm is misplaced. A familial-like relationship should discourage rather than foster a crude, demeaning, sexually charged work environment.

**IV. Conclusion.**

Based on the forgoing reasons, I would affirm the judgment of the district court. We must stop making excuses. Enough is enough. Sexual harassment is a real problem affecting real individuals. Moreover, "[s]exual harassment perpetuates the interlocked structure by which women have been kept sexually in thrall to men and at the bottom of the labor market." MacKinnon at 174.